881 F.2d 1165
 64 A.F.T.R.2d 89-5361, 58 USLW 2105, 89-2
USTC P 9515,
Fed. Sec. L. Rep. P 94,534
 SECURITIES AND EXCHANGE COMMISSION, Plaintiff-Appellee,
v.
Dennis LEVINE, a/k/a Mr. Diamond, International Gold, Inc.,
Diamond Holdings, S.A., and Bernhard Meier, Defendants,
Appeal of ARDEN WAY ASSOCIATES, et al. (The Arden Way
claimants), United States of America, Robert M.
Wilkis, Dennis B. Levine, and New York
State Department of Taxation
and Finance.
 Nos. 870-875, Dockets 88-6294, 88-6296, 88-6298, 88-6300,
88-6302 and 88-6304.
 United States Court of Appeals,
Second Circuit.
 Argued March 21, 1989.
Decided Aug. 2, 1989.
 
 Richard A. Kirby, Sr. Litigation Counsel (Daniel L. Goelzer, Gen. Counsel, Jacob H. Stillman, Associate Gen. Counsel, Paul Gonson, Sol., Joseph H. Harrington, Randall W. Quinn, Attys., S.E.C., Washington, D.C., on the brief), for plaintiff-appellee.
 Arthur L. Liman (Martin Flumenbaum, Lewis R. Clayton, Brad S. Karp, Robert Ernst, Paul, Weiss, Rifkind, Wharton & Garrison, New York City, on the brief), for defendant-appellant Levine.
 Debra L. Brown (George D. Reycraft, Richard J. Wiener, Pamela Rogers Chepiga, Cadwalader, Wickersham & Taft, New York City, on the brief), for appellants Arden Way claimants.
 James B. Mann, Deputy Asst. Atty. Gen., Tax Div., Dept. of Justice (William S. Rose, Jr., Asst. Atty. Gen., James I.K. Knapp, Acting Asst. Atty. Gen., Gary R. Allen, William S. Estabrook, Joan I. Oppenheimer, Attys., Tax Div., Dept. of Justice, Washington, D.C., on the brief), for appellant U.S.
 Marvin E. Frankel (Gary P. Naftalis, Michael J. Dell, Debora K. Grobman, Kramer, Levin, Nessen, Kamin & Frankel, New York City, on the brief), for appellant Wilkis.
 Rosalie J. Hronsky, Asst. Atty. Gen., New York City (Robert Abrams, Atty. Gen. of the State of N.Y., Frederic L. Lieberman, on the brief), for appellant New York State.
 Stanley Nemser, New York City (Wolf Popper Ross Wolf & Jones, New York City, David Berger, Berger & Montague, Philadelphia, Pa., on the brief), for amici curiae class action plaintiffs.
 Commodity Futures Trading Com'n (Marshall E. Hanbury, Gen. Counsel, Jay L. Witkin, Pat G. Nicolette, Deputies Gen. Counsel, Glynn L. Mays, Sr. Asst. Gen. Counsel, Susan M. Milligan, Atty., Washington, D.C.), amicus curiae.
 F.T.C. (Kevin J. Arquit, Gen. Counsel, Jay C. Shaffer, Deputy Gen. Counsel, Ernest J. Isenstadt, Asst. Gen. Counsel, Heather Hippsley, Leslie Rice Melman, Attys., Washington, D.C.), amicus curiae.
 Before OAKES, Chief Judge, and KEARSE and MAHONEY, Circuit Judges.
 KEARSE, Circuit Judge:
 
 
 1
 These appeals by (1) Dennis B. Levine and Robert M. Wilkis, defendants in civil actions commenced by plaintiff Securities and Exchange Commission ("SEC" or "Commission"), (2) the United States of America, to wit, the Internal Revenue Service ("IRS"), and the New York State Department of Taxation and Finance (the "State"), which have claims against Levine and Wilkis, and (3) Arden Way Associates, et al. ("Arden Way" or the "Arden Way claimants"), who are plaintiffs in a related action, challenge orders of the United States District Court for the Southern District of New York, Richard Owen, Judge, which, inter alia, imposed constructive trusts on the assets disgorged by Levine and Wilkis in the SEC actions and forbade payment of federal or state tax claims from the disgorged assets. See 689 F.Supp. 317 (S.D.N.Y.1988). On appeal, Levine, Wilkis, the IRS, and the State contend principally that the district court erred in refusing to require the SEC to pay the tax liabilities of Levine and Wilkis out of the disgorged assets; Arden Way contends that the court abused its discretion by approving a proposed distribution plan that does not provide for payments to Arden Way. For the reasons below, we conclude principally that the IRS is entitled to priority to the extent of approximately $8.5 million with respect to the assets disgorged by Levine; that in most other respects, the district court properly rejected the claims of Levine, Wilkis, and Arden Way; and that further proceedings are required for determination of certain additional claims advanced by the IRS.
 
 I. BACKGROUND
 
 2
 The present appeals arise out of SEC civil actions against Levine and Wilkis, New York investment bankers accused of engaging in insider trading, in violation of Secs. 10(b) and 14(e) of the Securities Exchange Act of 1934 ("1934 Act"), 15 U.S.C. Secs. 78j(b), 78n(e) (1982), and SEC Rules 10b-5 and 14e-3, 17 C.F.R. Secs. 240.10b-5, 240.14e-3 (1988). The sequence of the procedural events does not appear to be in dispute.
 
 
 3
 A. The Civil Suit and Liens Against Levine; The Consent Judgment
 
 
 4
 On May 12, 1986, the SEC commenced its action against Levine and two of his companies (collectively referred to as "Levine"), and one Bernhard Meier for alleged violations of the above securities laws. The complaint charged that from May 1980 through May 12, 1986, Levine had purchased common stock of, or options for common stock of, 54 companies that were targets of potential tender offers or candidates for actual or contemplated mergers or other business combinations. It alleged that Levine had traded on the basis of material nonpublic information that he knew or should have known had been obtained through misappropriation or breach of fiduciary duty, and that he had thereby defrauded other investors. The complaint alleged that Levine had gained some $11 million in profits, and the SEC sought, inter alia, disgorgement by Levine and his companies of funds received as a result of his unlawful conduct.
 
 
 5
 On May 12, the day its complaint was filed, the Commission obtained a temporary restraining order prohibiting Levine from disposing of any of his assets. On May 29, the district court issued a preliminary injunction extending this temporary freeze order.
 
 
 6
 In the meantime, the IRS had been investigating Levine's federal income tax liabilities for the years prior to 1986. On May 23, 1986, it issued an assessment for 1983-1985 totaling some $11 million, including deficiencies, interest and penalties, and obtained a lien for some $8.5 million. In November 1987, the IRS issued an assessment against Levine totaling approximately $1.2 million for the years 1980-1982, obtaining an additional lien. By December 31, 1987, Levine's outstanding assessed federal tax liability for the years 1980-1985, including interest, totaled approximately $12.2 million. In December 1987, the State issued an assessment against Levine for approximately $3.8 million of state and New York City (hereafter included in State) income tax liability. All of these amounts were based on Levine's profits in the allegedly unlawful stock transactions during the years 1980-1985, profits he had not reported on his income tax returns.
 
 
 7
 On June 4, 1986, Levine executed a Consent and Undertaking ("Consent") in which, without admitting or denying any of the allegations in the complaint, he consented to the entry of a "Final Judgment of Permanent Injunction and Other Equitable Relief" ("Proposed Judgment"), as annexed to the Consent. In the Consent, which was "Approved As To Form" by the SEC, Levine agreed to the entry of a permanent injunction prohibiting him from, inter alia, buying or selling securities while he was in possession of material nonpublic information, in violation of the securities laws. Levine also agreed to cooperate fully with the Commission in any other investigation conducted by or on behalf of that body. Most importantly for purposes of the present appeal, in p 8 of the Consent, Levine agreed to "disgorge assets of a value of approximately $11.5 million dollars [sic ] to [a receiver] to be available for satisfaction of any and all claims against the defendants arising out of the purchase and sale of securities by [Levine and his companies] as alleged in the COMPLAINT or by the defendants through Bank Leu International, Ltd. [sometimes referred to as "BLI"], pursuant to a Court approved plan to be proposed by the COMMISSION." The Consent provided that the Consent and the final judgment were to be incorporated in each other.
 
 
 8
 The Proposed Judgment noted that Levine had consented to the entry of the judgment "without admitting or denying the allegations of the COMPLAINT [and] without ... adjudication of any issue of fact or law." It provided for the appointment of a receiver to control the disgorged assets and to "distribute the assets to claimants with claims arising out of the purchase and sale of securities by Defendants as alleged in the COMPLAINT or by the Defendants through BLI, as ordered by this Court." It provided that none of the assets in the receivership estate would in any event be returned to Levine or his wife Laurie.
 
 
 9
 Under the Consent, Levine and his wife retained, inter alia, a cooperative apartment on Park Avenue, a 1983 automobile, an Individual Retirement Account, and the monies on deposit in two bank accounts. The Consent provided that Levine and his companies
 
 
 10
 will forever disclaim all right, title and interest in [the assets transferred to the receiver] except: (1) the Defendants and Laurie Levine retain the right to be heard as to the disposition of the assets held by the receiver pursuant to the FINAL JUDGMENT and (2) to the extent that any distribution of assets held by the receiver may have the effect of satisfying any claims against the defendants or Laurie Levine arising out of the purchase or sale of securities as alleged in the COMPLAINT or through BLI.
 
 
 11
 Levine acknowledged that "no promises or threats have been made by Plaintiff COMMISSION or any member, officer, agent, employee or representative thereof to induce him to enter this CONSENT except as provided herein." Consent p 4.
 
 
 12
 On June 5, 1986, the court signed the Proposed Judgment, and it was entered as the judgment of the court ("Judgment"). The Judgment ordered Levine to comply with the terms of the Consent and to disgorge the sum described in the Consent.
 
 
 13
 On June 5, the SEC sent a letter to Levine's counsel ("SEC side letter") stating that, with respect to p 8 of the Consent, the SEC interpreted the references to "claims arising out of the purchase and sale of securities" as including federal and state tax claims. The letter stated, in pertinent part, as follows:
 
 
 14
 [P]lease be advised that the Commission interprets the phrase "claims arising out of the purchase and sale of securities by [Levine] as alleged in the COMPLAINT or by the Defendants through Bank Leu International Ltd." to include: (1) claims for taxes due, penalties or interest thereon asserted by the Internal Revenue Service or New York State or New York City revenue authorities, based upon the securities transactions alleged in the Commission's Complaint or conducted by [Levine] through accounts at Bank Leu International Ltd., (2) any other claims, fines or penalties which may be asserted based upon the securities transactions alleged in the Commission's Complaint or conducted by [Levine] through accounts at Bank Leu International Ltd. Further, the Commission will assert all claims for disgorgement or penalties which are based upon the securities transactions conducted by the Defendants through accounts at Bank Leu International Ltd. solely against the sums to be disgorged to the receiver.
 
 
 15
 On June 19, 1986, Levine turned over approximately $10.6 million worth of assets to a receiver and transferred the remainder of the $11.5 million within a short period thereafter.
 
 B. The Criminal Proceedings Against Levine
 
 16
 On June 5, 1986, the government filed a four-count information against Levine, Levine having waived indictment. Count one charged him with having used material nonpublic information to defraud his employer in connection with the purchase and sale of the stock of Jewel Companies, Inc. ("Jewel"), in violation of the federal securities laws. The remaining counts charged him with perjury and income tax evasion.
 
 
 17
 On June 11, 1986, Levine pleaded guilty to all four counts. In February 1987, he was sentenced to concurrent two-year prison terms on each count and to fines totaling $362,000.
 
 C. The Proceedings Against Wilkis
 
 18
 The proceedings by the SEC, the IRS, and the State against Wilkis were roughly similar to those against Levine. In late June 1986, Wilkis signed a Consent and Undertaking ("Wilkis Consent"), pursuant to which he was to "disgorge all assets in which he ... ha[d] a beneficial interest, except for [certain enumerated assets].... Wilkis estimate[d] the disgorged assets to be of a value of approximately $3.3 million dollars [sic ]." Wilkis retained, inter alia, an Upper West Side cooperative apartment, a 1983 automobile, five Individual Retirement Accounts, a money market account, and the sum of $60,000. The proposed judgment incorporated in the Wilkis Consent paralleled the final judgment entered against Levine. By letter dated June 29, 1986, the Commission sent Wilkis a side letter similar to the June 5 letter it had sent Levine, construing the phrase "claims against the Defendant[ ] arising out of the purchase and sale of securities ...," to include claims for taxes due and penalties or interest thereon.
 
 
 19
 On July 1, 1986, the Commission filed its complaint against Wilkis, together with the Wilkis Consent and proposed judgment. The complaint alleged that since 1978, Wilkis had, inter alia, misappropriated and used material nonpublic information in order to trade in the stock of more than 52 issuers and had disclosed such information to Levine. On July 2, the district court adopted the proposed judgment and entered a Final Judgment of Permanent Injunction and Other Equitable Relief ("Wilkis Judgment").
 
 
 20
 On July 3, 1986, Wilkis turned over approximately $2.2 million worth of assets to a receiver, and an additional $1 million shortly thereafter.
 
 
 21
 On December 22, 1986, the government filed a four-count information against Wilkis, Wilkis having waived indictment. Count one charged him with having misappropriated material nonpublic information and having used it to defraud his employer in connection with the purchase and sale of the stock of Textron Inc. ("Textron"), in violation of the federal securities laws. This count also charged that Wilkis passed the information to Levine, who used it to trade in Textron stock. The remaining counts charged Wilkis with mail fraud, income tax evasion, and failure to report certain money transactions.
 
 
 22
 On December 24, 1986, Wilkis pleaded guilty to all four counts of the information. He was sentenced to various prison terms and probation.
 
 
 23
 Beginning in April 1987, the IRS obtained liens against Wilkis for federal tax liability for the years 1980-1986 totaling some $2.8 million, including deficiencies, interest, and penalties. In October 1987, the State issued an assessment against Wilkis for state and New York City (hereafter included in State) tax liabilities in the total amount of $595,000.
 
 
 24
 D. The SEC's First Proposed Plans and the Objections to Them
 
 
 25
 In November 1987, pursuant to the consents and the judgments, the SEC submitted to the district court its proposed plans for the distribution of the disgorged assets. Under these plans, each defendant's receivership fund was to be divided into two categories, to be distributed to different groups of claimants.
 
 
 26
 With respect to the assets disgorged by Levine, approximately 42% of the fund, or $4.87 million (the "Tax Fund"), was to be distributed between the taxing authorities, i.e., the IRS and the State, in proportion to their tax claims against Levine. Approximately 58% of the Levine fund, or $6.63 million (the "Investor Fund"), was to be distributed to the so-called "Eligible Investor Claimants," defined principally as persons who sold stock in the 54 companies on the days that Levine made his alleged purchases or who suffered losses on call options they sold on the stock of those companies contemporaneously with Levine's purchases of such options.
 
 
 27
 The plan proposed for distribution of the assets disgorged by Wilkis was similar. The principal difference was that the Commission designated approximately 49% of the fund for the authorities that had asserted tax claims against Wilkis, and 51% for investor claimants.
 
 
 28
 Both plans were opposed in some aspect by virtually every interested person, including Levine, Wilkis, the IRS, the State, Arden Way, and class action plaintiffs in other lawsuits. Levine and Wilkis, relying principally on the SEC side letters, asserted that the SEC had promised to devise plans paying all of the federal and state tax claims before paying any fraud claims of private parties. Levine also contended that his criminal fines and penalties were to be satisfied out of the disgorged assets.
 
 
 29
 The IRS and the State objected to each proposed plan on the ground that they enjoyed statutory preferences requiring them to be paid before other creditors. The IRS invoked principally 26 U.S.C. Secs. 6321 and 6322 (1982), under which federal tax liens are given priority in the distribution of receivership assets.
 
 
 30
 The Arden Way claimants, who were limited partners in an entity affiliated with Ivan F. Boesky whom they had sued with Levine, alleging that Levine had aided and abetted Boesky in a fraudulent scheme, also objected to the SEC's proposed plan. The plan did not include Arden Way among the investors to whom distributions were to be made, and they objected on the ground that Levine would be insolvent as a result of his disgorgement and thus unable to satisfy their claims against him.
 
 
 31
 The representatives of a plaintiff class of allegedly defrauded investors to whom the Investor Fund would be distributed supported the plans in large part. These investors, who had brought suits against Levine, Wilkis, and Boesky, took issue with the proposed method of calculation of a given investor's loss and with the treatment of persons who had traded in options.
 
 
 32
 In response to the various objections, the SEC argued, inter alia, that it had made no promises to Levine or Wilkis to give priority to payment of their tax liabilities. It stated that the consents belied any such promises, that the parol evidence rule prohibited consideration of any alleged oral promises, and that the side letters had merely "confirm[ed] that the Commission considered tax claims among those that could potentially be satisfied from the disgorged assets."
 
 
 33
 In opposition to the arguments of the IRS and the State that they enjoyed statutory priority, the SEC argued that Levine and Wilkis had "acquired no title to this money, no interest in this money," and hence the disgorged assets had never been property of the defendants to which tax liens could attach. The Commission argued that the profits had remained the property of the defrauded investors, who had "a valid, constructive trust claim to the monies which were identifiable proceeds of the defendants' illegal trading." As to the objections of Arden Way, the SEC argued that the Arden Way claimants lacked standing to oppose the plans.
 
 
 34
 The Commission urged the court to approve each plan as a fair accommodation of the various competing interests.
 
 
 35
 E. The District Court's Rejection of the Initial Plans
 
 
 36
 In July 1988, in an opinion reported at 689 F.Supp. 317, the district court rejected most of the objections to the plans, but also rejected the plans themselves. The court rejected Levine's argument that his criminal fine should be paid out of the disgorged assets, finding that neither the Consent nor the Judgment provided for such payment. Further, deeming it "almost an affront to suggest that those defrauded by Levine's insider trading activities should have their recovery reduced by the amount of his fine," the court held that the fine should not be paid out of Levine's illegal gains "to the detriment of investors" because the fine was "personal and punitive in nature." Id. at 321.
 
 
 37
 Addressing the contentions of Levine and Wilkis that the SEC had promised to give their tax debts priority, the court found those arguments untenable by reason of mutual mistake and, in any event, barred by the parol evidence rule.
 
 
 38
 Since this Court is sitting in equity to review the distribution of the assets currently in receivership, I reject the defendants' claims that the SEC, in entering into side letter agreements with defendants, agreed to accord tax claims priority status to the obvious reduction of the fund available for defrauded investors. A mere cursory review of the parties' representations as to their respective interpretations of the side letters reveals that they did not by any means attach the same or even a similar meaning to these letters. The SEC contends that it intended merely to delineate the group of eligible claims from the receivership funds, defining tax claims as being included under this rubric. Attorneys for Levine and Wilkis, on the other hand, argue strenuously that oral representations by the SEC, when viewed together with the side letters, provided assurance that tax claims were guaranteed to be satisfied on a priority basis. The letters themselves are arguably consistent with either view.
 
 
 39
 Given the parties' complete disagreement on the intent of the side letter agreements, I must and do treat these letters as void and of no effect here based on mutual mistake of the parties and do not consider them in construing the terms of Wilkis's or Levine's Consent[s] ... or Final Judgments. Restatement (Second) of Contracts Sec. 152 at 385 (1981) states that "where a mistake of both parties at the time a contract was made as to a basic assumption on which the contract was made has a material effect on the agreed exchange of performances, the contract is voidable" (emphasis added). There is no question that treatment of tax claims in the distribution of receivership assets was a hard-fought and much debated issue, and that the underlying assumptions regarding resolution of
 
 
 40
 this issue have had (and continue to have) a material effect on post-agreement proceedings. It is also evident that affording priority to tax claims would leave little or nothing for satisfaction of investors' claims while at the same time conferring substantial benefits on defendants. Under the equity powers of this Court, therefore, the side letters are voided.
 
 
 41
 689 F.Supp. at 320-21. The court also noted that " 'the scope of a consent decree must be discerned within its four corners, and not by reference to what might satisfy the purposes of one of the parties to it,' " id. at 321 (quoting United States v. Armour & Co., 402 U.S. 673, 682, 91 S.Ct. 1752, 1757, 29 L.Ed.2d 256 (1971)) (district court's emphasis deleted), and concluded that Levine and Wilkis were barred by the parol evidence rule from relying on the side letters or any contemporaneous oral representations as modifications of the terms of the consents or the judgments.
 
 
 42
 The court rejected the arguments of the IRS and the State that their tax liens had priority over other claims, ruling that those liens had not attached in the first instance because Levine and Wilkis
 
 
 43
 obtained the assets they disgorged through illegal trading activities. These assets are therefore analogous to funds which have been embezzled or misappropriated, as they were obtained by wrongful means and cannot properly be considered property of the defendants. Title to the funds was "acquired ... under such circumstances that [one] is under a duty to surrender it[.]" United States v. Fontana, 528 F.Supp. 137, 146 (S.D.N.Y.1981), quoting 5 A. Scott, Law of Trusts Sec. 462.4 (3d ed. 1967). Consequently, Levine and Wilkis held but bare legal title to these funds from the time they were obtained, with equitable title arising in investors who were injured as a result of their illegal activities. See SEC v. Paige, 1985 U.S.Tax Cas. (CCH) p 9588 (D.D.C. July 30, 1985) (under general rule of common law the victim, and not the embezzler, retains title to funds), aff'd, 810 F.2d 307 (D.C.Cir.1987) .... Thus, neither defendant ever had such property interests in the funds to which tax liens could have attached. Instead, holding bare legal title, they serve as trustees for the benefit of defrauded investors.
 
 
 44
 689 F.Supp. at 321-22.
 
 
 45
 The court further rejected the SEC's election to pay even a portion of the tax claims against Levine and Wilkis. It concluded that equity dictated imposition of a constructive trust holding all of the disgorged assets for defrauded investors in order to achieve two goals:
 
 
 46
 the first is restitution to injured investors and the second is preventing Levine and Wilkis from enjoying personal gain in the form of payment of their tax liabilities .... Consequently, it is legally and equitably appropriate to declare and recognize that a constructive trust arose at the time of Levine's and Wilkis's wrongdoing ... and that the disgorged profits are therefore held for the satisfaction of investors' claims.
 
 
 47
 Id. at 322 (footnote omitted).
 
 
 48
 The district court found no fault, however, with the SEC plans' exclusion of the Arden Way claimants from the class of persons entitled to make claims against the disgorged assets. The court noted that those claimants asserted "general-type damages ... much less directly linked to Levine's activities than the harm he caused contemporaneous investors," and that "[t]herefore, the Arden Way claimants do not enjoy a similar priority to Levine's disgorged assets." Id. at 323 n. 7.
 
 
 49
 In sum, the court disapproved the SEC's proposed plans because they included provision for payment of the tax claims, and it directed the Commission to submit revised plans. The court noted that "[s]hould there be funds remaining after the investors' claims have been satisfied, in that event the Court will deal with the issue of relative priorities to such remainder as between Arden Way, the IRS or any other claimants." Id.
 
 F. The SEC's New Plans
 
 50
 In August 1988, the SEC submitted amended plans of distribution. These plans proposed that, except for an administrative reserve, the entire fund would be distributed to "Eligible Claimants," defined in the way that "Eligible Investor Claimants" had been defined in the SEC's originally proposed plans. Thus, virtually all of the disgorged assets were earmarked for defrauded investors, with no allocation for tax liens.
 
 
 51
 Those who had objected to the original SEC plans objected to the revised plans. In a Memorandum and Order dated October 25, 1988, the court approved the new plans.
 
 
 52
 The court certified the issues for immediate appeal pursuant to 28 U.S.C. Sec. 1292(b) (1982), and this Court granted leave to appeal.
 
 II. DISCUSSION
 
 53
 On appeal, Levine and Wilkis contend that the district court erred in not construing the consents and judgments, as augmented by the SEC letters, to require the SEC to pay their assessed tax liabilities out of the disgorged assets. Levine contends that his criminal fines should similarly be paid out of those assets. The IRS and the State contend that as a matter of law their claims have priority and that the district court erred in not ordering their liens satisfied out of the disgorged assets prior to satisfaction of the claims of any other claimants. Arden Way contends that the district court erred in failing to require that the SEC plan make provision for the satisfaction of their claims out of the disgorged assets. For the reasons below, we conclude that the consents do not require the SEC to give priority to either the criminal fines or the claims of the taxing authorities; that the IRS is entitled as a matter of law to priority with respect to the lien that attached to Levine's property prior to June 19, 1986; that exclusion of the Arden Way claims was a permissible exercise of the Commission's discretion; and that the matters should be remanded for consideration of the IRS's alternative theories of priority and for the SEC to devise plans for the distribution, to the State and other claimants, of any disgorged assets remaining after payment of preferred IRS claims.
 
 A. IRS Priority Under Secs. 6321 and 6322
 
 54
 The IRS contends that as to the tax liabilities it has assessed against Levine and Wilkis, it is entitled as a matter of law under 26 U.S.C. Secs. 6321 and 6322 to payment in full from the assets they, respectively, disgorged. We conclude that under these sections the IRS was entitled to payment from Levine's disgorged assets of its lien filed against his property prior to June 19, 1986, but not with respect to its later assessments against Levine and not with respect to its assessments against Wilkis.
 
 
 55
 Section 6321 of the Internal Revenue Code provides as follows:
 
 
 56
 If any person liable to pay any tax neglects or refuses to pay the same after demand, the amount (including any interest, additional amount, addition to tax, or assessable penalty, together with any costs that may accrue in addition thereto) shall be a lien in favor of the United States upon all property and rights to property, whether real or personal, belonging to such person.
 
 
 57
 26 U.S.C. Sec. 6321. Section 6322, in pertinent part, provides that the Sec. 6321 lien "shall arise at the time the assessment is made and shall continue until the liability for the amount so assessed ... is satisfied or becomes unenforceable by reason of lapse of time." 26 U.S.C. Sec. 6322. The district court rejected the contention that Sec. 6321 gave the IRS priority, stating that the assets turned over to the receiver were "analogous to funds which have been embezzled or misappropriated, as they were obtained by wrongful means and cannot properly be considered property of the defendants.... Thus, neither defendant ever had such property interests in the funds to which tax liens could have attached." 689 F.Supp. at 321-22. We have two difficulties with the court's ruling.
 
 
 58
 First, the view that the assets "were" obtained by wrongful means suggests that the allegations of the SEC complaints had somehow been established. In fact, the court in the present case had made no such adjudication; the consents specified that the defendants neither admitted nor denied any of the allegations of the civil complaints; and the judgments specified that they were consented to without admission or adjudication. It is true that between the signing of the consents and the SEC's presentation of the distribution plans, both Levine and Wilkis had pleaded guilty to the criminal informations filed against them. But the charges in those informations were by no means coextensive with the allegations of the SEC's civil complaints. The Levine information mentioned only one specified issuer, i.e., Jewel; the civil complaint against him alleged unlawful transactions not only in the securities of Jewel but in securities of 53 other identified issuers as well. The Wilkis information likewise mentioned only one issuer, i.e., Textron; the civil complaint against Wilkis alleged that he had also committed unlawful acts with respect to the securities of more than 50 other issuers. The pleas of guilty thus did not establish wrongdoing in the vast majority of the transactions at issue in the civil suits. For more than 98% of the securities adverted to in the SEC civil suits, there was neither an adjudication nor a concession to ground the district court's premise that the disgorged assets were obtained as a result of the unlawful conduct alleged in the SEC complaints.
 
 
 59
 Second, even assuming that all of the allegations in the SEC complaints had been established, the district court's conclusion that Levine and Wilkis did not have property rights in the assets they disgorged was not warranted by the applicable legal principles. In determining whether the disgorged assets constituted "property ... belonging to" the assessed taxpayer within the meaning of Sec. 6321, we look principally to state law, for "it has long been the rule that 'in the application of a federal revenue act, state law controls in determining the nature of the legal interest which the taxpayer had in the property ... sought to be reached by the statute.' " Aquilino v. United States, 363 U.S. 509, 513, 80 S.Ct. 1277, 1280, 4 L.Ed.2d 1365 (1960). Nonetheless, though the federal tax lien statute " 'creates no property rights but merely attaches consequences, federally defined, to rights created under state law,' " id., other provisions of federal law may prevent the formation of such rights. Thus, if a taxpayer has purportedly acquired an interest by means of a transaction that violated a federal statute, the court should consider whether the federal statute has made the supposed transfer of property void:
 
 
 60
 When a federal statute condemns an act as unlawful, the extent and nature of the legal consequences of the condemnation, though left by the statute to judicial determination, are nevertheless federal questions, the answers to which are to be derived from the statute and the federal policy which it has adopted. To the federal statute and policy, conflicting state law and policy must yield.
 
 
 61
 Sola Electric Co. v. Jefferson Electric Co., 317 U.S. 173, 176, 63 S.Ct. 172, 174, 87 L.Ed. 165 (1942). If federal law made violative transactions void, the court would properly conclude that the transferee had thereby acquired no property right.
 
 
 62
 In the present case, the district court refused to recognize statutory priority for the IRS assessments against Levine and Wilkis on the ground that they had engaged in fraudulent transactions in violation of the 1934 Act, that those transactions were void, and that Levine and Wilkis therefore had acquired no property interest in the securities thereby obtained. The long-established interpretation of the 1934 Act, however, does not support the district court's construction. Section 29 of the 1934 Act provides, in pertinent part, that:
 
 
 63
 [e]very contract made in violation of any provision of this chapter or of any rule or regulation thereunder ... shall be void (1) as regards the rights of any person who, in violation of any such provision, rule, or regulation, shall have made or engaged in the performance of any such contract, and (2) as regards the rights of any person who, not being a party to such contract, shall have acquired any right thereunder with actual knowledge of the facts by reason of which the making or performance of such contract was in violation of any such provision, rule, or regulation ....
 
 
 64
 15 U.S.C. Sec. 78cc(b) (1982). Notwithstanding this section's use of the word "void," judicial interpretation has established that this provision "render[s] the contract merely voidable at the option of the innocent party." Mills v. Electric Auto-Lite Co., 396 U.S. 375, 387, 90 S.Ct. 616, 623, 24 L.Ed.2d 593 (1970); see id. at 386-88, 90 S.Ct. at 622-23. Thus the contract remains in force until the innocent party exercises his right to have it judicially set aside. Since federal law does not make the unlawful securities transaction void, but merely voidable, we must look to state law to see what property rights are conferred by a voidable transaction. See Aquilino v. United States, 363 U.S. at 513, 80 S.Ct. at 1280.
 
 
 65
 Under New York law, the culpable party to a voidable transaction acquires title, albeit voidable title, to the property he has received. Stanton Motor Corp. v. Rosetti, 11 A.D.2d 296, 203 N.Y.S.2d 273 (3d Dep't 1960). He may convey good title to a good-faith purchaser, see, e.g., Hartford Accident & Indemnity Co. v. Walston & Co., 21 N.Y.2d 219, 287 N.Y.S.2d 58, 234 N.E.2d 230 (1967); Stanton Motor Corp. v. Rosetti, 11 A.D.2d 296, 203 N.Y.S.2d 273, and an innocent party's lien may attach to the property in the culprit's possession, unencumbered by the equities between the parties on either side of the fraud, see Mendelsohn v. R. Simpson & Co., 267 A.D. 564, 47 N.Y.S.2d 489 (1st Dep't 1944). Since federal law makes contracts violating the 1934 Act voidable at the option of the victim, and state law grants title until the contract is voided, we conclude that property acquired by Levine or Wilkis in violation of the 1934 Act constituted property to which the federal tax lien could attach.
 
 
 66
 We note in passing that in general under state law a party who acquires property from a defrauding party and who has actual knowledge of the fraud may himself acquire only voidable title, see Anderson v. Blood, 152 N.Y. 285, 46 N.E. 493 (1897), and that the IRS, as part of the government, could be deemed to have knowledge of the wrongdoing attributed to Levine and Wilkis by other parts of the government. This state-law principle, however, cannot prevent attachment of a valid IRS lien because state law controls only with respect to the question of whether the taxpayer had a property interest. Once the latter question is answered in the affirmative, the validity of the government's tax lien is governed by federal law. See United States v. National Bank of Commerce, 472 U.S. 713, 722-23, 105 S.Ct. 2919, 2925, 86 L.Ed.2d 565 (1985). "State law define[s] the nature of the taxpayer's interest in the property, but the state-law consequences of that definition are of no concern to the operation of the federal tax law." Id. at 723, 105 S.Ct. at 2926; see also United States v. Bess, 357 U.S. 51, 55-57, 78 S.Ct. 1054, 1057-58, 2 L.Ed.2d 1135 (1958) (fact that property in question was of a type that under state law was not attachable by creditors' liens did not impede attachment of federal tax lien).
 
 
 67
 In sum, under federal law, Levine and Wilkis entered into contracts that were not void but merely voidable; state law gave them a property interest in the securities thereby acquired; and under federal law, that property interest was subject to a tax lien in favor of the government under Sec. 6321.
 
 
 68
 The acquisition of these property interests does not, however, mean that the IRS is necessarily entitled to prevail on all of its claims here, for Levine and Wilkis lost their property rights in the disgorged assets at the time of disgorgement. They transferred all "right, title and interest" in those assets to the receiver, and both consent judgments provided that "[n]o part of the receivership estate shall in any event be returned to the Defendants, ... their successors, heirs or assigns." Even if the assets in the receivership estate exceeded the value of the claims and the expenses of the receiver, the excess was not to be returned; rather, the balance was to be paid to the United States Treasury as a civil penalty. In transferring the assets, Levine and Wilkis reserved only the right to be heard as to the disposition of the assets. The right to be heard is not the power to control disposition, and the reservations that were agreed to were not sufficient to preserve ownership in the disgorged assets.
 
 
 69
 The facts that Levine and Wilkis acquired title to the assets in question prior to 1986 and yielded ownership on disgorgement in 1986 have varying implications for the claims at hand.
 
 1. The IRS Liens With Respect to Levine
 
 70
 Preliminarily, we note that the Commission suggests that Levine had lost his property rights in the disgorged assets prior to the IRS's first assessment against him on May 23, 1986, by virtue of the freeze order that was entered by the court on May 12. We reject this contention. The May 12 order was a temporary restraining order prohibiting Levine and his codefendants from "withdrawing, transferring, pledging, encumbering, assigning, dissipating, concealing or otherwise dealing with or disposing of any securities, funds or other assets of any of the defendants whatsoever and wherever situated or permitting any of the foregoing." Though the order required the defendants to deposit securities, funds, and other assets with the court immediately, in order to preclude dissipation, that relief was of a temporary character, as the order contemplated that after the deposits were made, the defendants would show cause why "each of the defendants" should not "hold and retain [these assets] within his or its control." The freeze order plainly did not purport to adjudicate Levine's right eventually to regain possession or full use of the property. Cf. United States v. Safeco Insurance Co. of America, Inc., 870 F.2d 338, 341 (6th Cir.1989). Although the restrictions were sufficiently significant to implicate due process concerns, see United States v. Moya-Gomez, 860 F.2d 706, 725-26 (7th Cir.1988), they did not deprive Levine of ownership.
 
 
 71
 As noted above, Sec. 6322 provides that an IRS lien attaches to the taxpayer's property at the time the assessment is made. Levine transferred ownership of nearly all of his disgorged assets on June 19, 1986. The IRS made its first assessment against him, giving rise to a lien of some $8.5 million, on May 23, 1986. The assessment created a lien on all of the property owned by Levine at that time. That property included the assets that were later transferred to the receiver. Accordingly, the IRS has a lien in that amount on the disgorged assets.
 
 
 72
 In contrast, the IRS's subsequent assessment on Levine occurred after disgorgement. Though this assessment too created a government lien on all the property then owned by Levine, Levine did not then own the disgorged assets. Hence, the IRS does not have a lien on the disgorged assets resulting from the later assessment.
 
 
 73
 Under Sec. 6321, therefore, the IRS is entitled to priority payment from Levine's disgorged assets in the amount of approximately $8.5 million, and no more. On remand, the district court will determine the precise amount of the lien.
 
 2. The IRS Lien With Respect to Wilkis
 
 74
 Wilkis disgorged most of his assets to the receiver on July 3, 1986, and the remainder by October 1986. All of the IRS's assessments on Wilkis occurred in 1987, subsequent to his disgorgements. Though these assessments created government liens on all the property then owned by Wilkis, Wilkis did not then own the disgorged assets. Hence, Sec. 6321 did not give the IRS a lien on any of the assets disgorged by Wilkis.
 
 
 75
 B. The IRS Claim of Priority Under 31 U.S.C. Sec. 3713(a)
 
 
 76
 The IRS argues, alternatively, that it is entitled to priority under 31 U.S.C. Sec. 3713(a)(1)(A) (1982). That section provides that a government claim is entitled to priority over the claims of others if the person indebted to the government is insolvent, lacks sufficient property to pay all his debts, and makes a voluntary assignment of property, or if that person is insolvent and commits an act of bankruptcy. Since liability for federal income tax arises shortly after the end of the taxpayer's tax year, i.e., at the time the tax return is due, see 26 U.S.C. Sec. 6151(a) (1982); Viles v. Commissioner, 233 F.2d 376, 379-80 (6th Cir.1956), and the taxpayer at that time becomes indebted to the government for any amounts not then or theretofore paid, the present argument is that, regardless of when the assessments were made, Levine and Wilkis were indebted to the government at the time of their disgorgements, and the disgorgements to the receiver triggered application of Sec. 3713(a)(1)(A). We are not in a position to rule definitively on the applicability of that section. Assuming arguendo that the appointment of a receiver would generally constitute an act of bankruptcy, but see Nolte v. Hudson Nav. Co., 8 F.2d 859, 866 (2d Cir.1925) (appointment of receiver not necessarily act of bankruptcy within meaning of predecessor to Sec. 3713(a)); cf. Manufacturers' Finance Co. v. McKey, 294 U.S. 442, 447, 55 S.Ct. 444, 446, 79 L.Ed. 982 (1935) (same with respect to bankruptcy statute), or that the assignment in the circumstances of this case can be termed "voluntary" within the meaning of the statute, the record does not indicate that the government established the insolvency of either Levine or Wilkis. Each was allowed to retain certain specified assets; the record is vague as to the extent of their debts.
 
 
 77
 The government's Sec. 3713(a) argument was rejected in the district court on the ground that the assets in question were held in constructive trust. In all the circumstances, and in light of our discussion in Part II.D. below, we leave it to the district court to consider this argument on remand.
 
 C. The Claims of the State
 
 78
 For reasons similar to those prompting our rejection of the IRS's claim of priority against Wilkis under 26 U.S.C. Sec. 6321, see Part II.A.2. above, we reject the claims of the State to priority on its claims against the assets disgorged by Levine and Wilkis. New York law provides that a lien in favor of the State attaches to a taxpayer's property, following the satisfaction of several preconditions, including notice, demand, and the filing of a warrant with the appropriate county clerk. N.Y.Tax Law Secs. 692(b)-(d) (McKinney 1987). As indicated in Parts I.A. and I.C. above, the State's liens attached in late 1987, long after the transfers of assets by Levine and Wilkis to the receiver. Since Levine and Wilkis no longer had any property rights to the transferred assets at the time the State's liens attached to their property, the liens attached only to such property as those individuals retained, not to the assets they had disgorged.
 
 D. The Effects of the Consents
 
 79
 Levine and Wilkis contend that even if the IRS and the State did not have priority for their tax claims as a matter of law, the consent judgments, read in light of the SEC side letters, required that those claims be given priority over the claims of others. Levine also contends that those documents required that his criminal fines be given priority. For the reasons below, we reject these contentions, though we conclude that the district court was not entitled to reject the SEC's initial plans merely because they proposed to pay a portion of the tax claims.
 
 
 80
 1. General Principles With Respect to Consent Judgments
 
 
 81
 The SEC suggests that the principal issue before us on these appeals is
 
 
 82
 whether a court of equity, as part of its ancillary relief in a Commission enforcement action, properly held that a constructive trust should be recognized in the disgorged illegal trading profits for the benefit of the victims of that trading or whether those trading profits should be used to pay taxes, penalties and interest that the defendants owe because they failed to report their illegal trading profits as income.
 
 
 83
 We disagree. Though this might be a proper characterization of the issues if we were reviewing relief granted after adjudication, it ignores the fact that the Commission gained control of the defendants' assets and was given the authority to propose plans for distribution of those assets only as a result of judgments entered on consent.
 
 
 84
 A consent judgment, though it is a judicial decree, is principally an agreement between the parties. Such judgments "should be construed basically as contracts, without reference to the legislation the Government originally sought to enforce but never proved applicable through litigation." United States v. ITT Continental Baking Co., 420 U.S. 223, 236-37, 95 S.Ct. 926, 934-35, 43 L.Ed.2d 148 (1975). Thus, consent judgments should be interpreted in a way that gives effect to what the parties have agreed to, as reflected in the judgment itself or in documents incorporated in it by reference:
 
 
 85
 Consent decrees are entered into by parties to a case after careful negotiation has produced agreement on their precise terms. The parties waive their right to litigate the issues involved in the case and thus save themselves the time, expense, and inevitable risk of litigation. Naturally, the agreement reached normally embodies a compromise; in exchange for the saving of cost and elimination of risk, the parties each give up something they might have won had they proceeded with the litigation. Thus, the decree itself cannot be said to have a purpose; rather the parties have purposes, generally opposed to each other, and the resultant decree embodies as much of those opposing purposes as the respective parties have the bargaining power and skill to achieve. For these reasons, the scope of a consent decree must be discerned within its four corners, and not by reference to what might satisfy the purposes of one of the parties to it. Because the defendant has, by the decree, waived his right to litigate the issues raised, a right guaranteed to him by the Due Process Clause, the conditions upon which he has given that waiver must be respected, and the instrument must be construed as it is written, and not as it might have been written had the plaintiff established his factual claims and legal theories in litigation.
 
 
 86
 United States v. Armour & Co., 402 U.S. 673, 681-82, 91 S.Ct. 1752, 1757, 29 L.Ed.2d 256 (1971) (footnote omitted; emphasis in original); see United States v. ITT Continental Baking Co., 420 U.S. at 233-37, 95 S.Ct. at 932-35. In keeping with these principles, we have noted that a court construing a consent decree is "not entitled to expand or contract the agreement of the parties as set forth in the consent decree." Berger v. Heckler, 771 F.2d 1556, 1568 (2d Cir.1985).
 
 
 87
 Construction of the consent judgment as a contract is constrained by traditional contract principles. Thus, documents that are expressly incorporated in the consent judgment should be considered. See United States v. ITT Continental Baking Co., 420 U.S. at 238, 95 S.Ct. at 935. Extrinsic evidence, however, may generally be considered only if the terms of the judgment, or of documents incorporated in it, are ambiguous. See, e.g., Schurr v. Austin Galleries of Illinois, Inc., 719 F.2d 571, 575 (2d Cir.1983) (applying New York law). With few exceptions, none of them pertinent here, evidence of contemporaneous agreements is not admissible in evidence to contradict a term of the writing. Restatement (Second) of Contracts Sec. 215, at 136 (1981).
 
 
 88
 With these principles in mind, we turn to the questions of whether SEC payment of the tax claims and criminal fines was required or permissible.
 
 
 89
 2. Consensual Priority for the Tax Claims and Criminal Fines
 
 
 90
 Within the above framework, each defendant's consent and judgment are properly read in tandem, for each consent incorporated the pertinent judgment by reference and provided that the consent was incorporated into that judgment. None of these documents, however, referred to or incorporated the SEC side letters. As set forth below, we conclude that the district court properly found there was no consensual priority for the criminal fines or tax claims over other claims since (1) the consents and judgments did not provide for priority, (2) the side letters or oral exchanges could not be used to vary the terms of the judgments, and (3) even if the side letters were considered, they did not provide for priority.
 
 
 91
 The documents submitted to the court as the parts of the judgment to be entered, i.e., the consents and the proposed judgments, did not purport to establish any priorities. Paragraph 8 of each consent stated that the disgorged funds were to be available for the satisfaction of any and all claims against Levine and Wilkis, respectively. Neither document stated that any class of claim would be preferred over any other class. Nor did the documents state that the funds were to be disbursed ratably or in proportion to the size of the claims asserted. Rather, the consents stated simply that the assets were to be distributed in accordance with a plan proposed by the SEC and approved by the court. Thus, a straightforward reading of these documents leads to the conclusion that the Commission was accorded substantial discretion in fashioning plans for the payment of claims against Levine and Wilkis arising out of the purchase and sale of securities alleged in the respective complaints.
 
 
 92
 We reject the arguments of Levine and Wilkis that the criminal fines and tax claims should have been given priority on the theory that the SEC had orally promised such priority during negotiations and had written the side letters to memorialize this undertaking. Plainly the terms of the documents could not properly be varied by oral promises. Nor were the side letters admissible to provide the advocated variation since the consents and judgments neither incorporated the side letters by reference nor provided that those letters could be looked to for assistance in interpreting the terms of the consents, and since the terms of the consents and the judgments were not in any significant respect ambiguous. Thus, we conclude that, as a matter of contract law, extrinsic evidence was not admissible to vary their terms.
 
 
 93
 Even if the SEC side letters were admissible, however, they would not warrant the interpretation advocated by Levine and Wilkis, for their language simply did not purport to require the SEC to give priority to the tax claims and criminal fines. Each letter stated that the SEC "interprets the phrase 'claims' " against that defendant " 'arising out of the purchase and sale of securities ... as alleged in the COMPLAINT ...' to include " tax claims and fines, etc. (Emphasis added.) Nowhere in either letter is there any indication that "inclu[sion]" was intended to mean placement at the top of a prioritized list.
 
 
 94
 Finally, we are constrained to note that the consent judgment is a special variety of contract, since it is a judicial decree. Thus, it is backed by the court's power to enforce compliance with it by means not available for the enforcement of ordinary contracts, e.g., by the court's power to hold a breaching party in contempt. This factor prompts us to observe that, when the parties have presented documents to the court that purport to reflect the boundaries of their agreements, and the court has given its official approval to those terms, the parties are not entitled to vary those terms without court approval. The court is not required to enforce, as part of the consent judgment, terms that it has not approved. It is an entirely appropriate exercise of the court's discretion to reject later-asserted variations that apparently were agreed to earlier than or contemporaneously with the judgment and that are virtually contradicted by the documents actually presented to the court. In Wilkis's case, for example, the SEC side letter is dated June 29, 1986. The SEC's complaint, the consent, and proposed judgment were submitted to the court on July 1. Thus, had the parties wished to have the terms of that letter deemed part of the judgment entered by the court they could easily have so provided and submitted it to the court. Instead, the Wilkis Consent and proposed judgment were submitted to the court for signing and entry without disclosure that there were any oral promises or side agreements, and, instead, with the express representation that "no promises ... except as provided herein" (Wilkis Consent p 4, emphasis added) had been made to induce Wilkis's agreement.
 
 
 95
 For all of the above reasons, we conclude that the district court properly rejected the contentions of Levine and Wilkis that the SEC, by agreement, was required to give priority to the payment of tax claims or criminal fines.
 
 3. The SEC's Original Plans
 
 96
 On the other hand, we believe the district court did not give proper effect to agreements that in fact were reflected in the consents and judgments. Primarily, we conclude that, because these were consent judgments and because the consents and judgments gave broad discretion to the SEC to propose plans for the distribution of the disgorged assets, the district court erred in disapproving so much of the original SEC plans as provided for payment of portions of the tax claims against Levine and Wilkis and in interposing its equity powers to impose constructive trusts.
 
 
 97
 The district court imposed constructive trusts because of its views that the assets disgorged by Levine and Wilkis had been "obtained by wrongful means," i.e., "obtained ... through illegal trading activities," and that as a matter of equity, those assets should be used not to pay defendants' taxes but to provide "restitution to injured investors and ... [to] prevent[ ] Levine and Wilkis from enjoying personal gain." 689 F.Supp. at 322. The court further stated that if the amount of disgorged funds exceeded the claims of contemporaneous investors, the court would determine the priorities among the other claimants. For two reasons, we conclude that the court expanded its role inappropriately.
 
 
 98
 First, the district court's premise was that all of the assets disgorged were the fruits of illegal transactions as alleged in the present complaints. As discussed in Part II.A. above, however, Levine and Wilkis did not admit those allegations; the allegations were not adjudicated in the present action; and the criminal proceedings with respect to each defendant involved only one of more than 50 securities at issue in his civil case. Thus, the court's premise overstated what was established by the record.
 
 
 99
 Second, as the Supreme Court noted in Armour, when a defendant agrees to a consent judgment, he "waive[s] his right to litigate the issues raised, a right guaranteed to him by the Due Process Clause," and thus, "the conditions upon which he has given that waiver must be respected." 402 U.S. at 682, 91 S.Ct. at 1757. We have seen no reason in the present cases to depart from the general rule that the proper role of the court vis-a-vis a consent judgment is to give effect to the terms negotiated by the parties. All of the cases relied on by the district court--or by the SEC in support of the district court's decision--for the proposition that a court may properly impose a constructive trust were cases in which the wrongdoing alleged had been established by adjudication. We are unaware of any case in which a constructive trust has been imposed in the absence of consent and in the absence of an adjudication. When the parties have agreed to confer on either party certain rights or privileges, and those agreements have been embodied in a judgment approved by the court, the court is not free to expand or constrict those terms or to impose unagreed-to equitable remedies that it might have fashioned "had the plaintiff established his factual claims and legal theories in litigation." Id.
 
 
 100
 To be sure, when the district judge is presented with a proposed consent judgment, he is not merely a "rubber stamp." If he found, for example, that the proposed decree would not further the objectives of the law on which the complaint was based, he could properly decline to approve the proposed judgment. See Local No. 93, International Association of Firefighters v. City of Cleveland, 478 U.S. 501, 525, 106 S.Ct. 3063, 3076, 92 L.Ed.2d 405 (1986); see generally id. at 524-29. But if he elected to disapprove unless a certain term that he thought appropriate were included, the parties would have the options of including that term or declining to proceed with the consent judgment. For example, had the Levine Consent and Proposed Judgment provided that Levine's taxes and criminal fine were to be paid out of the assets he disgorged, and had the court refused to enter such a judgment, Levine would have been free not to go forward with the settlement. Once the judgment consented to has been entered as the judgment of the court, the court is by and large required to honor the terms agreed to by the defendant. But see System Federation No. 91, Railway Employes' Department v. Wright, 364 U.S. 642, 651, 81 S.Ct. 368, 373, 5 L.Ed.2d 349 (1961) (court may subsequently modify decree if law has changed).
 
 
 101
 In accordance with these principles, we note that if the consent judgments in the present matters had explicitly required the SEC to pay a portion of the defendants' taxes out of the disgorged assets, the district court would have been obliged to enforce those provisions. These judgments did not so provide; but they did provide that the SEC was to devise plans for the distribution of the disgorged assets. It is true that each judgment provides that the court "shall ... determine the appropriate disposition of the assets held by the receiver," but the consents and judgments repeatedly state that the court-approved plan is "to be proposed by the COMMISSION." Implicit in this language was a grant of discretion to the Commission, including the flexibility to decide that certain groups of claimants would receive payments and others would not. No restrictions were imposed on the Commission's authority to make these choices or to give priority to one group over another. Though the Commission's discretion was made subject to the approval of the court, the consents and proposed judgments made clear that the parties gave primary responsibility for devising a plan to the Commission. By approving the proposed judgments, the district court approved the grants of discretion to the SEC.
 
 
 102
 In light of these provisions, we conclude that the district court was not empowered to exclude from the distribution plans any legitimate claimant or class of claimants designated as eligible by the SEC's plans. Thus, if the SEC believed it appropriate to use a portion of the disgorged assets to pay a portion of the tax claims, federal or state, against the defendants, the court was not entitled to forbid that allocation.
 
 
 103
 Nor was the court, having entered the consent judgments, entitled to impose its own views as to the appropriate priorities among legitimate claimants and to reorder the choices made by the SEC. For example, though the district court rejected the contention of the Arden Way claimants that they were entitled to be included in the SEC's distribution plan because the claims of contemporaneous investors were more worthy than the more "general" claims of Arden Way in the eyes of the court, we uphold the result on the basis that the exclusion of those claimants was within the prerogative of the Commission. Similarly, the court's statement that if the approved distributions did not exhaust the disgorged funds the court would decide the priorities among the remaining claimants was beyond the scope of its authority. The consent judgments conferred that authority principally on the SEC.
 
 
 104
 In sum, we conclude that whether or not the court would have been empowered to impose a constructive trust on assets disgorged pursuant to a judgment entered after adjudicating claims unfavorably to a defendant, it did not have a proper basis for imposing such trusts here.
 
 
 105
 Finally, though we note that the Commission states on these appeals that it "believes that Congress did not intend to allow identifiable, unlawfully obtained property rightfully belonging to the victims of securities fraud, to be used to pay the wrongdoer's taxes," we decline to adopt this position principally for two reasons. First, for the reasons stated in Part II.A.1. above, we have concluded that certain of the predisgorgement tax claims have priority as a matter of federal law. We would find it difficult, in light of this conclusion, to conclude that as a matter of public policy payment of postdisgorgement assessments, simply because they were made later, is forbidden. Second, the SEC's original position, as stated to the district court, was that tax claims were among those that could potentially be satisfied from the disgorged assets, and that its initial plans, which proposed some distribution to the taxing authorities and some to defrauded investors, were fair accommodations of the various competing interests. There being no apparent reason to believe the initial plans were contrary to public policy or were proffered or endorsed by the Commission in bad faith, we think those plans, except to the extent that IRS statutory priorities interfered, should have been upheld.
 
 
 106
 We do not mean to suggest that the Commission could not properly have taken the position from the outset that no voluntary payments would be made to the taxing authorities. Just as we deem it within the Commission's discretion, under the consents and judgments negotiated here, to exclude the criminal fines imposed against Levine or the claims of persons such as the Arden Way claimants, we think the Commission could properly have exercised the discretion conferred on it in any of a number of ways. If a defendant wishes to ensure that a certain class of claims will be paid out of funds to be disgorged in settlement of an action against him, he is free to insist in negotiations that such a provision be included in the consent and judgment and is free not to agree to the judgment if the desired provision is not included. In the absence of such an enforceable agreement, however, the defendant has no assurance that the allocation he desires will be forthcoming.
 
 
 107
 In the present case, though the defendants did not have the right to compel specific allocations because they did not negotiate inclusion of such an agreement by the Commission in the consent judgments entered by the court, we conclude that since the SEC exercised its discretion in the first instance to propose distribution of part of the disgorged funds to the taxing authorities and urged the court to approve those plans as fair accommodations of the various competing interests, and since there is no public policy of which we are aware that would preclude that exercise of discretion, the SEC's initial plans should have been largely approved.
 
 E. Proceedings on Remand
 
 108
 For the foregoing reasons, we conclude that the district court erred in ruling that the IRS was not entitled to payment out of the assets disgorged by Levine of the amount of the lien that attached to his property prior to disgorgement. We remand to the district court for a determination of the precise amount of that lien, and for a determination of the IRS's alternative claim that it is entitled to priority under 31 U.S.C. Sec. 3713(a)(1)(A) on the ground that Levine and Wilkis were insolvent.
 
 
 109
 In the event that the court determines the Sec. 3713(a) claim to be without merit, the SEC's original plan for distribution of the assets disgorged by Wilkis should be approved; the SEC's original plan with regard to Levine, which had allocated the plan's Tax Fund to the federal and state taxing authorities in proportion to their claims, should be reconsidered by the SEC to determine the amount to be awarded the State in light of the priority to which the IRS is entitled. The SEC should similarly reconsider the distribution plans if the court determines that the Sec. 3713(a) claim has merit, and if after application of that section there remain disgorged assets to be distributed.
 
 CONCLUSION
 
 110
 The orders of the district court are (1) affirmed insofar as they (a) rejected the contention of Levine that the SEC is required to pay his criminal fines out of the disgorged assets, (b) rejected the contentions of Levine and Wilkis that the SEC is required by the consents and judgments to give priority to payment of the tax claims made by the IRS and the State, and (c) rejected the objections of the Arden Way claimants; (2) reversed insofar as they rejected the claim of the IRS to priority with respect to the lien that attached to the property of Levine prior to June 19, 1986; and (3) vacated and remanded for a determination of the IRS's claims of priority under 31 U.S.C. Sec. 3713(a) and for further proceedings not inconsistent with this opinion.