**SECURITIES AND EXCHANGE COMMISSION, Plaintiff,**

v.

**Emanuel PINEZ, Defendant, and Lehman Brothers, Inc., Relief Defendant.**

**Civil Action No. 97–10353–PBS.**

United States District Court, D. Massachusetts.

Dec. 16, 1997.

Jeffrey W. Kobrick, Stuart P. Feldman, Carlos Costa–Rodrigues, Linda Bridgeman, John M. D'Amico, Juan Macel Marcelino, Grant David Ward, U.S. Securities & Exchange Commission, Boston, MA, for Securities and Exchange Commission.

Francis J. DiMento, DiMento & Sullivan, Boston, MA, for P.G. Technologies.

John C. Bartenstein, Robert K. Gad, Mark Szpak, Ropes & Gray, Boston, MA, for Lehman Brothers.

**328**

John J. Falvey, Jr., Assistant U.S. Attorney, Boston, MA, for United States of America.

James B. Adelman, Choate, Hall & Stewart, Boston, MA, for Paine Webber, Inc.

Glen DeValerio, Berman, DeValerio & Pease, Boston, MA, for Centennial Technologies, Inc., Special Committee of the Board of Directors.

Robert L. Ullman, Nutter, McClennen & Fish, Boston, MA, for Nutter, McClennen & Fish.

Vincent M. Amoroso, Robert A. McCall, Peabody & Arnold, Boston, MA, Sarah R. Wolff, Sachnoff & Weaver, Chicago, IL, for Greg Goldsmith, Craig Anderson, Robert Wasserman, Timothy Werner, Lakota Trading.

Glen DeValerio, Norman Berman, Matthew Miller, Berman, DeValerio & Pease, Boston, MA, for Investors in Centennial Technologies, Inc.

Dennis M. Kelleher, Thomas J. Dougherty, Skadden, Arps, Slate, Meagher & Flom, Boston, MA, for Coopers & Lybrand, Partnership.

Marilyn D. Stempler, Andrew P. Strehle, Andrew Strehle, Brown, Rudnick, Freed & Gesmer, Boston, MA, for Felix, Inc.

## MEMORANDUM AND ORDER

SARIS, District Judge.

## I. INTRODUCTION

This action arises out of the alleged illegal insider trading practices of the former Chairman and Chief Executive Officer of Centennial Technologies, Inc. ("Centennial"), Emanuel Pinez ("Pinez"). On February 14, 1997, the Securities and Exchange Commission ("SEC") filed a complaint against Pinez alleging that he traded in options on the common stock of Centennial while in possession of material, nonpublic information regarding Centennial's true financial condition in violation of section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. § 78j(b), Rule 10b–5, 17 C.F.R. § 240.10b–5, promulgated thereunder, and section 17(a) of the Securities Act of 1933 ("Securities Act"), 15 U.S.C. § 77q(a). The SEC's complaint, and its accompanying *ex parte* motion for a temporary restraining order, requested that Pinez be restrained from committing further acts of securities fraud, and that any and all assets that are "in the name of, in the custody of, held for the benefit of, or subject to the control of" Pinez be frozen to prevent dissipation. In a written order dated February 14, 1997, this Court temporarily restrained the allegedly fraudulent business practices of defendant Pinez[1] and his agents, and froze the assets in several accounts alleged to be under defendant Pinez's direct or indirect control.[2]

The SEC now seeks to transform its temporary restraining order freezing Pinez's assets into a preliminary injunction against Pinez and all persons and institutions holding assets under the control of or for the benefit of the defendant. One such financial institution, the brokerage firm of Lehman Brothers, Inc. ("Lehman"), objects to a preliminary injunction as it would apply to it, arguing that Lehman has an immediate and unconditional entitlement to the proceeds of the liquidated option securities that it held in Pinez's margin account.[3]

---

1. At the time of the restraining order, Pinez was being held in jail pending indictment on criminal charges arising from these allegations. All discovery in the civil case has been stayed.

2. After hearings on February 18 and 19, the Court clarified its restraining order by consensus to allow brokerage firms in possession of option securities allegedly illegally obtained by Pinez to liquidate them. After a hearing on February 24, the Court extended its TRO for an additional 10 days. Pinez consented to an indefinite extension of the TRO pending this Court's decision on the SEC's motion for a preliminary injunction. The

TRO has expired, pursuant to Fed.R.Civ.P. 65(b), with respect to Lehman. However, Lehman, as a courtesy to the Court, agreed to maintain the funds in the escrow account until the Court ruled on the SEC's motion for a preliminary injunction.

3. An attorney representing the brokerage firm of Payne Webber has appeared at each of the hearings in this matter and seems to be taking a "me too" stance in regard to Lehman's claims. Since Payne Webber has made no formal filings stating its position, however, its claims are not considered or addressed by the Court.

After hearing, the Court **ALLOWS** the SEC's motion for a preliminary injunction freezing Pinez's assets, including the $4.69 million held in the Lehman escrow account.

## II. *FACTUAL BACKGROUND*

The SEC has presented the following evidence:

### A. *Centennial—A Star Performance*

From 1989 until 1997, Pinez was the Chairman, Chief Executive Officer ("CEO"), and Secretary of Centennial Technologies, Inc., which is a publicly-traded corporation in Billerica, Massachusetts that manufactures parts for computer systems and owns stock in several other computer manufacturing companies. During 1996, Centennial's stock, which was registered with the SEC and traded on the New York Stock Exchange ("NYSE"), increased in price by nearly 451% and was determined to be the best performing issue on the NYSE. As the chief executive, Pinez owned approximately 25% of Centennial's common stock.

In February of 1996, Pinez opened a private client services account with Lehman, a corporation that provides financial and brokerage services. In opening the account, Pinez entered into a "Client Agreement," granting Lehman a security interest in the assets held in his account. That fall, Pinez executed the "Margin Account Agreement" portion of the Client Agreement which made him eligible to engage in margin transactions and to borrow money from Lehman secured against the assets in the account. At the time the margin account was established, the assets that Pinez surrendered as collateral consisted mainly of shares of Centennial stock. Pinez borrowed substantial amounts of money from Lehman secured against these shares, which were valued at approximately $55–$58 per share at the end of December of 1996. At that time, Lehman estimates that these shares had a value of more than $14 million.

### B. *A Falling Star*

By January 31, 1997, the market value of Centennial stock had declined to approximately $23.75 per share. Having just released a public statement reporting substantial earnings for the second quarter of the 1997 fiscal year,[4] Centennial's Board of Directors ("Board") began to question the company's revenue recognition and inventory valuation for the second quarter of 1997. On January 31, 1997 the SEC initiated an investigation of Centennial and requested Mr. Pinez's trading records from Lehman. On that date, Lehman knew that the SEC had launched an investigation of Centennial because the SEC requested trading records from Lehman in a letter.

At a meeting on February 4, which Pinez attended, a corporate officer informed the Board that Coopers & Lybrand, Centennial's public accountant, was concerned about Centennial's accounts in regard to a specific client and had asked to meet with the company's Audit Committee to discuss the matter. During a conversation immediately following the meeting, it was clearly stated that Centennial directors and officers should not trade Centennial securities while the matters were being investigated.

On February 5, 1997, amidst allegations from Centennial employees about the misstated measure of the company's inventory, the Board appointed a committee of four directors to examine the accuracy of Centennial's reported earnings and financial statements and Pinez's credentials. On February 6, 1997, Pinez was advised that he may be asked to resign as CEO. On Friday, February 7, the Board directed Centennial's Chief Financial Officer ("CFO"), James Murphy, to personally conduct a physical audit of the corporation's merchandise.

### C. *Margin Indebtedness*

By January 30, 1997, Pinez's margin indebtedness to Lehman was approximately

---

4. Centennial's fiscal year ends on June 30. The 1997 fiscal year commenced on July 1, 1996, and its first and second quarters ended September 30, 1996 and December 31, 1996, respectively. On January 30, 1997, Centennial announced earnings of $3.46 million for the second quarter of 1997. These earnings represented a significant increase over the $996,000 that Centennial reported earned for the second quarter of 1996.

$5.5 million—and the debt grew larger as the value of the Centennial stock that Pinez had pledged to secure the loan declined. According to Julianne Call, the operations manager of Lehman's Boston office, Lehman was watching the account intensely throughout January to make sure Lehman was not going too far out on a limb as the price dropped from $58 to $40 to $35 a share. By January 30, it had declined to $30 a share.

On February 7, as the Board began investigating the possibility of material misrepresentations in Centennial's earnings reports, Pinez contacted Franklin Pierce, his account representative at Lehman, and requested that Lehman execute a "zero-cost collar" transaction at market to hedge against any further downward movement of the Centennial stock in his margin account. Pierce understood Pinez's request, which was made at approximately 1:00 PM on Friday, February 7, to mean that Pinez wanted to purchase a substantial number of "put" option contracts, which are options to sell stock at a set price, using money that was generated by selling "call" option contracts, which are options to buy stock at a set price. With put options, Pinez could sell his Centennial stock at a predetermined price regardless of its market value; thus, purchasing puts would shield Pinez from further losses due to Centennial's declining market price. Moreover, because the proceeds from selling calls would offset the cost of purchasing the puts, Pinez could get this protection against the continued downfall at no extra cost to him.

To effectuate such a "zero-cost collar" by the end of that business day, as Pinez had specifically requested, Pierce and his supervisor, Julianne Call, calculated that Lehman would need to trade approximately 6000 options contracts before 4:00 PM. Per firm policy, Pierce and Call consulted with Lehman officials in New York and requested authorization before agreeing to undertake this sizeable transaction.[5]

Once Lehman authorities had cleared the transaction and Pinez had given a firm order to purchase the puts and sell the calls, Pierce contacted Lehman's floor trader at the Chicago Board Options Exchange ("CBOE"), Don Klein, who commenced making "combo trades"[6] with Centennial options traders ("market makers"[7]). By the close of trading on that Friday, February 7, Klein, on behalf of Pinez, had purchased 2,700 puts and sold 2,700 calls—affecting nearly 540,000 shares of underlying Centennial stock. The options, which expired on the third Friday in March, had an exercise price ("strike price") of $20 per share for the calls and either $20 or $17.50 per share for the puts. The market price of Centennial stock at the close of trading on Friday, February 7 was $18 per share. According to the SEC, these trades constituted more than 75 percent of the total volume of Centennial options contracts traded on the CBOE that day.

The precipitous demand for an options trade was significant to Lehman because it well knew that Pinez had never engaged in options trading through his Lehman account before February 7, 1997. Lehman had previously urged him to trade in options in the summer of 1995, and intended to act as a principal, rather than a broker, in the "derivative" trading because it would obtain more lucrative commissions. However, Pinez declined Lehman's "Monetizing Participating Collar" derivatives proposal because he would not have been able to participate in the upside potential of the stock.

Although the margin debt was now over $5 million, and growing, Lehman approved an

---

5. Pierce testified that he checked with a legal staff member in New York who voiced an interest in having Lehman be a counterparty to the transaction, but Pierce quickly deep-sixed that idea because of the time pressure.

6. Combo trades are trades in which the customer seeks either: (1) to buy calls and sell puts, or (2) to sell calls and buy puts. When the customer requests the latter, as Pinez did, he is essentially betting that the price of the underlying stock will decrease before the options expire.

7. As of February 7, 1997, there were five CBOE traders who made markets in the options of Centennial (Centennial options are also listed for trading on the American Stock Exchange). Under CBOE rules, the market makers were required to satisfy certain customer demands for options, even if doing so meant trading options for their own accounts. The CBOE market makers are, thus, the primary victims of Pinez's alleged insider trading.

increase of $320,000 in Pinez's margin loan in order to pay for the execution of the trades. Based on press reports, although he had no "definite proof" and was "speculating," Pierce believed it was "very likely" and a "good chance" that Pinez may be expediting the trade with the expectation he might resign or be asked to step aside because he had falsified his resume and/or his credentials as a professional. (SEC.2d Supp.App. Tab C, Ex. 3 at 361.) Pierce discussed this with both McCall and Machan.

This rush to collar came at a time when Lehman officials were skittish about the account. Weeks earlier it had loaned Pinez nearly $3 million and had received as collateral "restricted" Centennial stock. This means it was restricted from the resale to the public market because of Pinez's position as an officer and director of Centennial. It was also unregistered. Because of Lehman's palpable concerns about its unsalable collateral, Pinez had volunteered to deliver $2 million in checks as a deposit in the margin account as additional collateral. He failed to do this, and Lehman employees, like Julianne McCall and Pierce, skeptically viewed his offer to deposit checks as a check's-in-the-mail decoy. By the end of January, Pinez deposited 318,735 additional Centennial shares so that the value of the shares (excluding the 120,000 unregistered shares) stood at about $11 million, which was then sufficient to secure Pinez's debt of $5.5 million. But, the value of the stock continued to decline.

### D. *Offshore Companies*

Pinez was in control of, and is a beneficiary of, several offshore companies that had brokerage accounts at Lehman including Felix, Inc., a company located in St. Helier, Jersey, Channel Islands, U.K. Felix is wholly owned by the SEKA Trust. Pinez was the settlor of the trust, and became a beneficiary on August 3, 1996. Felix's account at Lehman trades exclusively in Centennial stock. From the time that the Felix account had been opened at Lehman, Pierce knew that Pinez controlled Felix and received monies from it. Pierce executed trades in the Felix account based on Pinez's instructions and sometimes without the advance knowledge of Felix's administrator, George Machan. On February 6 and 7, 1997, in addition to the illegal options trades that are at the heart of this suit, Pinez also engaged in inside trading through the Felix account. On February 5, 1997, Pinez instructed Verite Trust Company Ltd. ("Verite") to sell Centennial stock. Verite is an offshore entity which established the Felix account and which had the sole authority to direct trades in the Felix account at Lehman. On February 6 and 7, Machan ordered Lehman to execute the sale in an orderly way to avoid a "fire sale" price by not selling all the shares at once. (SEC 2nd Supp.App. Tab C, Ex. 3 at 362–364.) On February 6 and 7, Lehman brokers sold 40,000 shares of Centennial stock (worth more than $808,000) for Felix.

Pierce had been warned by Felix's administrator, George Machan in August and September of 1996, in written correspondence, that trading in Centennial stock by Felix may be illegal insider trading because of Pinez's position as an officer of Centennial and as Felix's beneficiary. In the fall of 1996, Felix's administrator and Lehman mutually agreed to discontinue trading in Centennial stock for Felix. There is no evidence that anyone else at Lehman was familiar with these significant insider trading concerns. Notwithstanding that agreement, on February 6 and 7, Lehman sold Centennial common stock for Felix. Machan and Pierce discussed the reasons for the drop in stock prices and the heavy trading in Centennial stock during the trades on February 6 and 7. In a file note, Machan states as follows:

> Lehman Brothers stated that the main reason for the decline in the stock was that it was on an extremely high multiple and that Mr. Emanuel Pinez who had stated to have had degrees from certain universities had been discovered not to hold those degrees and that, therefore, the market being suspicious of what other statements had been made which may prove not to be correct had downgraded the shares accordingly.

> Further [Machan] was of the opinion that in view of the fact that Mr. Pinez had requested the sale of 40,000 shares that his

confidence in Centennial Technologies Inc. had also been severely shaken.

[Machan] further noted that Rick Pierce of Lehman Brothers stated that it was *highly possible* that Mr. Pinez would be asked to resign as President of the Company known as Centennial Technologies Inc.

(Emphasis added) (PR.Ex.6).

On February 25, Lehman wired approximately $965,800 out of the Felix brokerage account to a Felix account in the U.K., with full knowledge that Pinez exercised control of and was a beneficiary of Felix's owner and notwithstanding the Court's February 14, 1997 order prohibiting the release of funds controlled by Pinez. Lehman has reached a stipulation agreement with the SEC regarding the wired monies and has voluntarily undertaken to establish an escrow account funded in the amount of $965,880.72 to cover funds that were released to Felix should the Court ultimately find that the funds were wrongfully obtained.

Lehman also sold stock worth several million dollars for other offshore entities that Pinez had introduced to Lehman in 1995, including Collectors Credit International ("CCI"), a company located in Jersey, the Channel Islands, and Suncrest Limited ("Suncrest"), a Bahamian corporation. On February 6 and 7, Lehman sold 95,000 shares of Centennial common stock for CCI, yielding net proceeds, after commissions, of $1,938,552.05. These sales were also ordered by George Machan of Verite. On February 13, 1997 Lehman wire transferred $1,942,-326.50 to Chase Manhattan Bank and thence to the Channel Islands, leaving the CCI account with a remaining balance of 64 cents. Between January 31, 1997 and February 5, 1997 Suncrest sold 152,000 shares of Centennial stock though Lehman, yielding net proceeds, after commissions, of $3,309,757.19. The sales of Centennial stock for Suncrest, Felix and CCI were executed by Mssrs. Pierce and Scott Bobeck, another Lehman broker. During this week of February 3, 1997, Lehman also sold Centennial stock for three other individuals introduced by Pinez.

## E. *Pinez's Public Exposure*

During the weekend of February 8 – 9, after conducting an audit of Centennial's inventory and finding that the book value of the inventory had been substantially misrepresented, Centennial CFO Murphy confronted Pinez privately. Pinez suggested to Murphy that, to solve the problem, he should alter the numbers on the inventory tags that mark the products in the corporation's storage area. Murphy refused.

On Monday, February 10, in response to questioning by Board members at a scheduled meeting, Pinez admitted several facts suggesting his complicity in and knowledge of Centennial's inaccurate earnings reports. Specifically, Pinez revealed that he had himself previously altered the labels measuring the value of the corporation's inventory; that he had arranged elaborate fictitious sales transactions for unrequested and undelivered goods; and that the fourth-quarter 1996 and second-quarter 1997 reports contained material overstatements. At the end of the Board meeting, which lasted into the morning of Tuesday, February 11, the Board issued a press release stating that it had removed Pinez as chief executive officer and that it was inquiring into Centennial's reported earnings for the second quarter of 1997 as well as the financial statements for prior time periods. All directors and officers present at the meeting were again admonished not to trade Centennial securities.

On Tuesday morning, February 11, in response to Centennial's press release, the NYSE suspended trading in Centennial stock. The closing price of the stock the day before was $16 3/4 As the stock price declined, the value of the margin debt increased.

## F. *Lehman's Margin Call*

Having learned that Centennial had removed Pinez as CEO, that the company was investigating the accuracy of its reported earnings and financial statements, and that trading in Centennial stock was suspended, Lehman contacted Pinez late in the day on February 11 and informed him it was issuing a call for repayment of all amounts Pinez owed Lehman—to date, over $6 million.

Lehman gave Pinez until 3:00 on February 12 to satisfy the outstanding debt.

When Pinez had not surrendered the amount of the call as of the close of business on Wednesday, February 12, Lehman took steps to enforce its lien against the property in Pinez's margin account. It liquidated all the publicly-traded, non-Centennial securities in the account first; however, Pinez's debt to Lehman still remained at slightly over $5 million. The NYSE's suspension of trading in Centennial securities, which lasted from Tuesday, February 11 until Tuesday, February 18, prevented Lehman from completing the liquidation process prior to the SEC filing suit against Pinez.

### III. PROCEDURAL HISTORY

On February 14, 1997, the SEC presented this Court with a complaint against Pinez and a motion to enjoin temporarily, preliminarily, and permanently further illegal trading by and for the defendant. The SEC also sought to freeze the assets in several enumerated and unenumerated accounts, including the Lehman margin account, which were in Pinez's name and were, presumably, under his control. This Court immediately granted the SEC's *ex parte* motion for a temporary restraining order and ordered Pinez's assets frozen. On the same day, Pinez was arrested on related criminal charges, and detained as a flight risk.

At hearings on February 18 and 19, this Court clarified the temporary restraining order it had issued in the civil action, allowing Lehman, and the similarly-situated brokerage firm of Paine Webber, to liquidate the option securities in Pinez's margin accounts and to hold the proceeds from those transactions in a separate escrow account pursuant to the TRO.

On February 24, the SEC requested an extension of the *ex parte* TRO for an addi-

tional 10–day period pursuant to Fed. R.Civ.P. 65(b). At the hearing on the SEC's request, Lehman objected to further continuation of the TRO as against it, arguing orally that the Court had no jurisdiction to enjoin Lehman's access to the funds in Pinez's defaulted margin account. Over Lehman's objection and with the consent of the SEC and Pinez, the Court extended the TRO for 10 additional days.

On March 6, the Court held a hearing on the SEC's request to transform the expired TRO into a preliminary injunction. Pinez was indicted on federal securities law charges on March 12, 1997, and the civil action has been stayed pending resolution of the criminal case.

### IV. DISCUSSION

#### A. Standard for Preliminary Injunctive Relief

■ Generally speaking, courts are to determine the appropriateness of granting or denying a preliminary injunction on the basis of a four-part test that takes into account (1) the movant's likelihood of success on the merits, (2) the potential for irreparable injury, (3) a balancing of the relevant equities, and (4) the effect on the public interest. *Sunshine Dev., Inc. v. F.D.I.C.*, 33 F.3d 106, 110 (1st Cir.1994). Because of "the statutory imprimatur given SEC enforcement proceedings," SEC requests for injunctive relief pursuant to 15 U.S.C. § 78c(d) and (e) need not involve " '[p]roof of irreparable injury or the inadequacy of other remedies as in the usual suit for injunction.' " *Securities and Exch. Comm'n v. Mgmt. Dynamics, Inc.*, 515 F.2d 801, 808 (2d Cir.1975) (quoting 3 Louis Loss & Joel Seligman, Securities Regulation 1979 (1961 & Supp.1969)).[8] Rather, "[t]he 'critical question' in issuing an injunction [in an SEC enforcement action] is whether 'there is a reasonable likelihood that the wrong will be

8. Section 21(d) of the Securities Exchange Act states:

Whenever it shall appear to the Commission that any person is engaged or is about to engage in acts or practices constituting a violation of any provision of this title, the rules or regulations thereunder, [or the rules of the national exchanges or other authorities], it

may in its discretion bring an action in the proper district court of the United States ... to enjoin such acts or practices, and upon a proper showing a permanent or temporary injunction or restraining order shall be granted without bond.

15 U.S.C. § 78u(d) (1996); *accord* Securities Act § 20(b), 15 U.S.C. § 77t(b).

repeated.'" *Mgmt. Dynamics*, 515 F.2d at 807 (quoting *Securities and Exch. Comm'n v. Manor Nursing Ctrs., Inc.*, 458 F.2d 1082, 1100 (2d Cir.1972)); *see also Securities and Exch. Comm'n v. Warner*, 674 F.Supp. 836, 839–40 (S.D.Fla.1987).

▪ Courts have found that the SEC is entitled to permanent injunctive relief if it demonstrates that a defendant has violated and will continue to violate federal securities laws unless enjoined. *See, e.g., Securities and Exch. Comm'n v. Prof'l Assoc.*, 731 F.2d 349, 353 (6th Cir.1984); *Securities and Exch. Comm'n v. Youmans*, 729 F.2d 413, 415 (6th Cir.1984), *cert. denied sub nom. Holliday v. Sec. and Exch. Comm'n*, 469 U.S. 1034, 105 S.Ct. 507, 83 L.Ed.2d 398 (1984); *Securities and Exch. Comm'n v. First Fin. Group of Texas*, 645 F.2d 429, 435 (5th Cir.1981). Similarly, the SEC can obtain a preliminary injunction if it has a likelihood of succeeding on its claim for permanent injunctive relief. *See, e.g., Securities and Exch. Comm'n v. World Radio Mission, Inc.*, 544 F.2d 535, 541 (1st Cir.1976) (noting that an "amply supported finding of the likelihood of future violations would ordinarily, without more, entitle plaintiff to a preliminary injunction."); *Securities and Exch. Comm'n v. Gen. Refractories Co.*, 400 F.Supp. 1248, 1255 (D.D.C.1975) (issuing preliminary injunction because "[t]he SEC has made a prima facie case that the defendants have engaged and are currently engaging in a course of conduct violative of the antifraud provisions of the exchange Act, and that, unless enjoined, will continue to engage in such violative conduct.").

▪ In *Securities and Exch. Comm'n v. Unifund SAL*, 910 F.2d 1028, 1035–40 (2d Cir.1990), the United States Court of Appeals for the Second Circuit considered the legal standard to be applied in determining whether the SEC has made "a proper showing" entitling it to a preliminary injunction under the federal statute. The Court concluded that, while the SEC has the burden of demonstrating a likelihood of success on the merits of its claim that federal securities laws have been and will continue to be violated,

> a district court, exercising its equitable discretion, should bear in mind the nature of the preliminary relief the Commission is seeking, and should require a more substantial showing of likelihood of success, both as to violation and risk of recurrence, whenever the relief sought is more than preservation of the status quo.

*Id.* at 1039. Accordingly, where the SEC sought to enjoin future securities violations, a sanction that the *Unifund SAL* Court characterized as "having grave consequences," the government is required to "make a substantial showing of likelihood of success as to both a current violation and the risk of repetition." *Id.* at 1040. However, where the SEC sought merely to freeze the violator's accounts in the manner of an attachment, described as "an ancillary remedy," the *Unifund SAL* Court determined that a lesser showing of likelihood of success was sufficient to obtain a freeze order that "preserve[d] [the Commission's] opportunity to collect funds that may yet be ordered disgorged." *Id.* at 1041.

The *Unifund SAL* approach is a thoughtful and persuasive guide to evaluating the SEC's offer of proof in an enforcement action seeking injunctive relief. Because the injunctions requested at this stage in the instant action—a preliminary injunction prohibiting future violative trades by Pinez and an order prohibiting dissemination of the funds in Pinez's accounts—implicate different showings by the SEC under the *Unifund SAL* analysis, this Court addresses them separately.

### B. *Preliminary Injunction to Prohibit Securities Violations*

▪ The SEC claims that Pinez has violated Section 17(a) of the Securities Act,[9] Sec-

---

9. In relevant part, Section 17(a) of the Securities Act, 15 U.S.C. § 77q(a), provides:

It shall be unlawful for any person in the offer or sale of any securities by the use of any means or instruments of transportation or communication in interstate commerce or by the use of the mails, directly or indirectly—
(1) to employ any device, scheme, or artifice to defraud, or
(2) to obtain money or property by means of any untrue statement of a material fact or any

tion 10(b) of the Securities Exchange Act,[10] and Rule 10b–5 promulgated thereunder,[11] and that, thus, he should be preliminarily enjoined from committing further acts of securities fraud.

The SEC has demonstrated a strong likelihood of success on the merits of its claim that Pinez has engaged in practices that operated to defraud investors in Centennial stock and/or options. The affidavits and other documents that the government has submitted indicate that, as CEO of Centennial, Pinez was privy to material, non-public information regarding Centennial's financial condition (indeed, he allegedly assisted in contributing to that condition), and that he knowingly traded in Centennial option securities on the basis of that inside information.

Other than the allegation in the complaint that Pinez's fraud is "ongoing," however, the SEC has presented no evidence that Pinez is likely to engage in insider trading practices *in the future*, an allegation that is essential to its prima facie case for preliminary injunctive relief. *See Securities and Exch. Comm'n v. Caterinicchia,* 613 F.2d 102, 105 (5th Cir.1980) ("The Commission needs to go beyond the mere fact of past violations.") (quoting *Securities and Exch. Comm'n v. Blatt,* 583 F.2d 1325, 1334 (5th Cir.1978)). While "the commission of past illegal conduct is highly suggestive of the likelihood of future violations," *Mgmt. Dynamics,* 515 F.2d at 807; in any given case, "[w]hether the inference that the defendant is likely to repeat the wrong is properly drawn ... depends on the totality of the circumstances." *Id.; accord Securities and Exch. Comm'n v. Zale Corp.,* 650 F.2d 718, 720 (5th Cir.1981), *cert. denied sub nom. Underwood v. Sec.*

*and Exch. Comm'n,* 454 U.S. 1124, 102 S.Ct. 973, 71 L.Ed.2d 111 (1981); *see also Securities and Exch. Comm'n v. Holschuh,* 694 F.2d 130, 144 (7th Cir.1982) ("In predicting the likelihood of future violations, a court must assess the totality of the circumstances surrounding the defendant and his violation, including such factors as the gravity of the harm caused by the offense; the extent of the defendant's participation and his degree of scienter; the isolated or recurrent nature of the infraction and the likelihood that the defendant's customary business activities might involve him in such transactions; the defendant's recognition of his own culpability; and the sincerity of his assurances against future violations.").

A review of the record at this preliminary stage of the case indicates that the SEC has failed to make an adequate showing regarding the likelihood that Pinez will engage in future securities violations during the pendency of this action. Although the alleged prior conduct is grave and Pinez's participation prominent, the record evidence suggests that Pinez's status as CEO gave him a unique opportunity to overstate the value of Centennial's inventory and to use this inside knowledge in making option "bets" on the company's decline. Pinez's current circumstances—as terminated chief officer, ousted board member, and prison inmate awaiting trial in an institution where non-privileged calls are recorded—weigh heavily against his ability to repeat the alleged wrongful conduct, at least prior to trial. Further, in light of the extensive press coverage of Centennial's demise, there is virtually no likelihood of trading in Centennial stock based on "insider" information. On the current record, with

omission to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, or

(3) to engage in any transportation, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser.

**10.** The Exchange Act, § 10(b), 15 U.S.C. § 78j(b), makes it "unlawful for any person, directly or indirectly, ... [t]o use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, any

manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors."

**11.** 17 C.F.R. § 240.10b–5 essentially makes it unlawful: "(a) [t]o employ any device, scheme or artifice to defraud"; "(b) [t]o make any untrue statement of a material fact or to omit to state a material fact"; or "(c) [t]o engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person."

no evidence from which the court can reasonably infer that recurrent violations are likely, the SEC has little likelihood of success on the merits of its claim for a preliminary injunction against Pinez. *See, e.g., Securities and Exch. Comm'n v. Warner,* 674 F.Supp. 836, 840 (S.D.Fla.1987) (denying a motion for a preliminary injunction because "[t]he SEC has failed to prove the likelihood of further violations by the defendant.").

The SEC acknowledges that there is no risk of further trading based on insider information with respect to Centennial's stocks. However, it argues that Pinez possesses material non-public information about publicly-traded companies other than Centennial, specifically Websecure, Inc. The SEC states it is investigating at least six publicly registered companies that "may have been influenced, and may still be influenced, by defendant Pinez." The flaw in this argument is that there is no evidence that Pinez has insider information about Websecure or any continuing control over it from his jail cell. In any event, the asset freeze prohibits Pinez from trading through any offshore or nominee accounts he controls directly or indirectly.

The portion of the SEC's preliminary injunction motion that seeks to enjoin Pinez from violating federal securities laws pending trial must be **DENIED** without prejudice to renewal of a request for a permanent injunction.

### C. *Order to Freeze Assets*

An order to freeze the assets of a person who is allegedly engaged or about to be engaged in activities that are violative of federal securities laws "functions like an attachment." *Unifund SAL,* 910 F.2d at 1041; *accord Securities and Exch. Comm'n v. Current Financial Servs.,* 783 F.Supp. 1441, 1443 (D.D.C.1992). In an SEC enforcement action, "[t]he ultimate remedies available to the court include disgorgement, restitution, and rescission;" and it is well-established that "[t]o preserve a basis for such remedies, the court may impose an interim asset freeze." *Securities and Exch. Comm'n v. Comcoa Ltd.,* 887 F.Supp. 1521, 1524 (S.D.Fla.1995) *aff'd sub nom. Levine v. Comcoa Ltd.,* 70 F.3d 1191 (11th Cir.1995), *cert. denied sub*

*nom. Grossman v. Sec. and Exch. Comm'n,* — U.S. ——, 117 S.Ct. 53, 136 L.Ed.2d 16 (1996); *accord Sec. and Exch. Comm'n v. Am. Bd. of Trade,* 830 F.2d 431, 438 (2d Cir.1987), *cert. denied sub nom. Economou v. Sec. and Exch. Comm'n,* 485 U.S. 938, 108 S.Ct. 1118, 99 L.Ed.2d 278 (1988); *Securities and Exch. Comm'n v. Int'l Loan Network,* 770 F.Supp. 678, 696 (D.D.C.1991), *aff'd* 968 F.2d 1304 (D.C.Cir.1992).

■■■ "[I]n deciding whether to issue such an order, 'the disadvantages and possible deleterious effect of a freeze must be weighed against the considerations indicating the need for such relief.'" *International Loan Network,* 770 F.Supp. at 696 (quoting *Securities and Exch. Comm'n v. Manor Nursing Ctrs.,* 458 F.2d 1082, 1106 (2d Cir. 1972)). In the usual case, once the SEC has demonstrated a likelihood of success on the merits of its claim that a defendant has committed a violation of federal securities law, it can obtain an order that preserves the proceeds of such violation until it may be proven at trial "even in circumstances where the elements required to support a traditional SEC injunction have not been established." *Unifund SAL,* 910 F.2d at 1041; *see also Securities and Exch. Comm'n v. Lauer,* 52 F.3d 667, 671 (7th Cir.1995) (finding that for an interlocutory freeze order to issue "[a]ll that is required is a degree of likelihood" that a violation has been committed "coupled with greater irreparable harm from the denial of the injunction than from the grant."); *Commodity Futures Trading Commission v. Amer. Metals Exch. Corp.,* 991 F.2d 71, 79 (3d Cir.1993) (allowing a temporary freeze on all of the defendant's assets until the court has an opportunity to determine the extent of the ill-gotten gains).

■■ In this case, as discussed above, the SEC has shown a likelihood of success on the merits of its claim that Pinez has violated the anti-fraud provisions of the federal securities acts. An asset freeze is necessary to maintain a realistic possibility of recovering the proceeds of this illegal activity after trial, and Pinez has made no showing that a continuation of the freeze, subject to modifications by the Court when necessary to pay the attorneys fees for the criminal trial or essential

household expenses (e.g., mortgage payments) will have substantial deleterious effects.[12] The SEC's general motion to continue the Court's order freezing Pinez's assets is *ALLOWED.*

### D. *Lehman's Objection*

While not questioning the propriety of the general asset freeze, Lehman Brothers objects to the SEC's identification of it as an institution in possession of assets belonging to Pinez. Lehman asserts that, by virtue of its lien agreement, the assets in the margin account are its own, and that the SEC essentially has no likelihood of successfully establishing that they are subject to disgorgement by virtue of Pinez's alleged fraud. Lehman urges the Court to lift the freeze as it applies to the assets in the margin account by considering first whether the Court even has jurisdiction to enjoin Lehman's access to the assets since Lehman is a non-party that has been accused of no wrongdoing; and, second, whether the SEC is likely to succeed in establishing that the money in the account is *not* Lehman's property, and thus, that it is subject to the freeze order.

### 1. *Jurisdiction*

■ The first (and less complicated) of Lehman's contentions has seemingly been resolved by the SEC's filing of an amended complaint naming Lehman as "a relief defendant" in this case. Even without this proviso, however, Lehman's first contention is easily answered. Federal courts have jurisdiction pursuant to 15 U.S.C. § 78u(d) and (e) to freeze the assets of a wrongdoer in the possession of a non-party. *See Securities and Exch. Comm'n v. Cherif,* 933 F.2d 403, 414 n. 11 (7th Cir.1991) ("A court can obtain equitable relief from a non-party against whom no wrongdoing is alleged if it is established that the non-party possesses illegally obtained profits but has no legitimate claim to them."), *cert. denied,* 502 U.S. 1071, 112 S.Ct. 966, 117 L.Ed.2d 131 (1992).

■ Courts also have jurisdiction to decide the legitimacy of ownership claims made by non-parties to assets alleged to be proceeds from securities laws violations. *Id.; see also Securities and Exch. Comm'n v. Antar,* 831 F.Supp. 380, 398–399 (D.N.J.1993) (citing cases that hold a federal court has jurisdiction to order relief from non-parties in federal securities actions). A non-party property holder is enjoinable as a nominal defendant "without an assertion of subject matter jurisdiction only because he has no ownership interest in the property which is the subject of litigation," *Cherif,* 933 F.2d at 414. Accordingly, the freeze order cannot continue to issue against Lehman as a nominal defendant if it has a legitimate claim to the assets in Pinez's margin account. Only if the SEC is likely to be successful ultimately in establishing that Lehman's ownership interest in the proceeds of the options trades that are in Pinez's margin account is subordinate to the property interest of the defrauded investors is this Court's jurisdiction properly asserted. *Cf. Lauer,* 52 F.3d at 671 (finding that, in deciding whether to impose a preliminary asset freeze, "[t]he court must assess the probability of the plaintiff's succeeding in the trial on the merits, and one ingredient of that success is, of course, establishing that the court has jurisdiction.").

### 2. *Lehman's Property Interest*

The SEC maintains that Lehman has no interest in the proceeds of the illegal options transactions (and is, thus, a proper nominal defendant) because a constructive trust arose in the proceeds of Pinez's fraud at the time the fraud was committed, and a creditor's lien cannot attach to a constructive trustee's bare legal title. Alternatively, the SEC argues that even if Lehman has some property interest in the proceeds to which a valid lien could attach, any such interest is subordinate to the interests of the defrauded investors because Lehman is not a bona fide purchaser for value under federal or state law. Lehman's entitlement to the proceeds of Pinez's

---

**12.** Pinez has sought to have the freeze modified in regard to the payment of attorney fees for his criminal defense. The Court allowed that proposed modification and referred the matter to U.S. Magistrate Judge Cohen, who had handled Pinez's criminal detention hearing, for a determination of the reasonableness of the fees requested. This Court has also allowed limited fees with respect to Pinez' defense of his civil action, and certain household expenses.

allegedly illegal options trades thus appears to hinge on three underlying issues: (a) whether an automatic constructive trust in the illegal options securities prevented Pinez from obtaining property rights in the assets to which Lehman's lien could attach; (b) whether Lehman's lien did in fact attach to those securities; and (c) whether Lehman is entitled to the proceeds as a bona fide purchaser, regardless of the claims of the defrauded investors.

Bearing in mind that, at this juncture, the SEC must only demonstrate a likelihood of success on the merits of its claim that Lehman has a subordinate interest, if any, in the assets in the margin account (and thus that Lehman is properly joined as a nominal defendant), the Court will now consider each of these issues in turn. *See Lauer,* 52 F.3d at 671 ("[T]he court need no more be certain that it has jurisdiction [to impose an interlocutory asset freeze] than it need be certain that the plaintiff has a winning case.").

### a. *Constructive Trust*

First, the SEC argues that because a constructive trust arose in the proceeds of Pinez's fraud at the moment it was committed, Pinez had only bare legal title to those proceeds, a property interest that is not subject to a creditor's lien.

In *Securities and Exch. Comm'n v. Levine,* 881 F.2d 1165 (2d Cir.1989), the Second Circuit addressed specifically the issue of whether a perpetrator of securities fraud had property rights in the proceeds of that fraud to which a creditor's lien could attach. *Levine* involved the allocation of the disgorged proceeds of an insider trading scheme after the defendants, who were accused of using material, nonpublic information to defraud investors, pleaded guilty to securities fraud and consented to the entry of judgment against them in the SEC's civil action. When the federal and state tax authorities claimed that their statutory tax liens had priority over the claims of the defrauded investors, the district court employed the doctrine of constructive trusts and concluded that "neither defendant ever had such property interests in the funds to which tax liens could have attached." *Securities and Exch. Comm'n v. Levine,* 689 F.Supp. 317, 322

(S.D.N.Y.1988), *aff'd in part, rev'd in part,* 881 F.2d 1165 (2d Cir.1989). The district court maintained that because of their fraud, the defendants "held but bare legal title to these funds from the time they were obtained, with equitable title arising in investors who were injured as a result of their illegal activities." *Id.*

On appeal, the Second Circuit disagreed. *See Levine,* 881 F.2d at 1174. Relying on "applicable legal principles" rather than the doctrine of constructive trust, *id.* at 1175, the Circuit Court set forth a two-part analysis of the property interests conveyed to persons who have obtained assets by violating federal securities laws. First, in assessing the property rights of one who "has purportedly acquired an interest by means of a transaction that violated a federal statute," the *Levine* Court determined that a court "should consider whether the federal statute has made the supposed transfer of property void." *Id.* This initial inquiry is crucial to evaluating the transgressors' property interests, for "[i]f federal law made violative transactions void, the court would properly conclude that the transferee had thereby acquired no property right." *Id.* If the transaction is merely "voidable" under federal law, the *Levine* analysis requires that a court must then "look to state law to see what property rights are conferred by a voidable transaction." *Id.* at 1176 (citing *Aquilino v. United States,* 363 U.S. 509, 513, 80 S.Ct. 1277, 1280, 4 L.Ed.2d 1365 (1960), which held that "state law controls in determining the nature of the legal interest which the taxpayer had in the property ... sought to be reached by the statute."). Applying this two-part analysis to the facts of the case before it, the *Levine* panel concluded that:

> Since federal law makes contracts violating the 1934 [Securities Exchange] Act voidable at the option of the victim, and state law grants title until the contract is voided, ... property acquired by [the defendants] in violation of the 1934 Act constituted property to which the federal tax lien could attach.

*Id.* at 1176.

Under the *Levine* analysis, the allegedly illegal option transactions in this case are

merely "voidable" not void. *See* 15 U.S.C. § 78cc(b); *Mills v. Electric Auto–Lite Co.,* 396 U.S. 375, 386–87, 90 S.Ct. 616, 622–23, 24 L.Ed.2d 593 (1970). Both New York and Massachusetts law allows wrongdoers who are parties to voidable transactions to acquire title and to convey good title to a bona fide purchaser. *See, e.g., Kaminsky v. Karmin,* 187 A.D.2d 488, 489, 589 N.Y.S.2d 588, 590 (1992) (quoting *Ross v. Leuci,* 194 Misc. 345, 347, 85 N.Y.S.2d 497, 499 (1949)); *Clark & White, Inc. v. Fitzgerald,* 332 Mass. 603, 607 127 N.E.2d 172, 175 (1955).

The SEC urges the Court to reject the *Levine* analysis, arguing that *Levine* ignores case law that creates a constructive trust as a matter of law from the moment property is unlawfully obtained. *See, e.g., United States v. Fontana,* 528 F.Supp. 137, 146 (S.D.N.Y.1981). However, in reversing the *Levine* trial court, which relied heavily on *Fontana,* the Second Circuit makes *Fontana* wobbly foundation for the government. In the SEC's view, Pinez had a duty to return the property at the time the fraud was committed; thus, Lehman could only have acquired from Pinez an ownership interest in the securities that is subordinate to the defrauded investors right to restitution. The SEC's argument that a constructive trust imposed on Pinez trumps Lehman's rights in this case is faulty.

In the first place, in seeking a constructive trust on these facts, the SEC virtually ignores a fundamental tenet of constructive trust doctrine: that the property holder be unjustly enriched. *See United States v. Cannistraro,* 694 F.Supp. 62, 72 n. 11 (D.N.J. 1988) ("The courts impose the remedy of constructive trust where, rightfully or wrongfully, a party had obtained property that unjustly enriches him.") (citing 5 A. Scott, *Scott on Trusts,* § 462.2, at 347 (3d ed.1967)), *aff'd in relevant part,* 871 F.2d 1210 (3rd Cir.1989), *cert. denied,* 500 U.S. 916, 111 S.Ct. 2011, 114 L.Ed.2d 98 (1991). Lehman is not unjustly enriched in the amount of the proceeds of Pinez's alleged fraud merely because Pinez may have obtained those assets unlawfully, as the SEC argues. A constructive trust requires a showing of unjust enrichment that is independent of the wrongful act giving rise to the need for such a remedy. *See Alsco–Harvard Fraud Litigation,* 523 F.Supp. 790, 806–07 (D.D.C.1981)(finding that a constructive trust arises when there is (1) a wrongful act, (2) proceeds that are traceable to that act, *and* (3) "a reason why the party holding the property should not be allowed in good conscience to keep it."); Restatement of Restitution § 160 (1937) ("Where a person holding title to property is subject to an equitable duty to convey it to another on the ground that he would be unjustly enriched if he were permitted to retain it, a constructive trust arises.").

Second, in arguing for an automatic imposition of a constructive trust, the SEC fails to apply the equally well-established doctrine of the bona fide purchaser for value. Under the Uniform Commercial Code, a purchaser can acquire good title to property in spite of the seller's wrongful acquisition (and over the objection of the victims) if he gives value and has no notice of the claims against the seller. *See, e.g., Morgan Guaranty Trust Co. of N.Y. v. Third Nat'l Bank of Hampden County,* 400 F.Supp. 383, 389 (D.Mass.1975) (applying M.G.L. c. 106, § 8–302), *aff'd,* 529 F.2d 1141 (1st Cir .1976); N.Y.U.C.C. § 8–302. Courts have imposed a constructive trust when there has been fraud in an underlying transaction only when the holder of the proceeds is *not* a bona fide purchaser. *See, e.g., Hazlett v. Fusco,* 177 A.D.2d 813, 815, 576 N.Y.S.2d 427 (1991); *Sullivan v. Sullivan,* 321 Mass. 156, 158–59, 71 N.E.2d 894 (1947); *see also Restatement of Restitution* § 172(1), at 691 (1937) ("Where a person acquires title to property under such circumstances that otherwise he would hold it upon a constructive trust ..., he does not so hold it if he gives value for the property without notice of such circumstances.").

The Court concludes, as did the *Levine* Court, that a perpetrator of securities fraud has a voidable property interest in the proceeds of the illegal transaction to which a creditor's lien can attach. Applying this analysis to the instant case, when Lehman purchased 2700 put options and sold 2700 call options at Pinez's direction on February 7, 1997 allegedly in violation of the prohibition against insider trading, Pinez acquired a

voidable property right in those options assets in his margin account to which Lehman's security interest could attach.

### b. *Attachment of Lehman's Lien*

■ The SEC does not dispute that Lehman took a security interest in the property in Pinez's margin account by virtue of its Client Agreement ("agreement") entered into in February of 1996 and governed by the New York Uniform Commercial Code.[13] Paragraph 14 of the agreement, which was signed by Pinez as a condition of opening his private services account with Lehman in February of 1996, states:

> As security for the payment of all liabilities or indebtedness presently outstanding or to be incurred under this or any other agreement between us, I grant you a security interest in any and all property belonging to me or in which I may have an interest, held by you or carried in any of my accounts.... [14]

Under New York law, "a security agreement is effective according to its terms." N.Y.U.C.C. § 9–201. Moreover, placing its constructive trust argument to one side, the SEC does not otherwise challenge the validity of Lehman's lien on the proceeds of the options purchased and sold on February 7, 1997, to satisfy Pinez's outstanding margin indebtedness. Under N.Y.U.C.C. § 8–321(1),[15] Lehman's security interest in the options and their proceeds "attached" when they where "transferred" to Lehman for Pinez's margin account. *See* N.Y.U.C.C. § 8–313(1). Pursuant to the margin agreement, Lehman had given "value" in the form of a loan to Pinez, who, according to the *Levine*

analysis, retained "rights in the security" of his potentially voidable transactions. N.Y.U.C.C. § 3–321(2); *see also* 4 James J. White & Robert S. Summers, *Uniform Commercial Code* § 31–12, at 166 (4th ed.1995). The Court thus concludes that Lehman's lien attached to the options assets in Pinez's account as of February 7, 1997 within the meaning of New York law.[16] The dispositive question becomes whether Lehman's lien is superior or subordinate to the competing property interests of the defrauded investors.

### c. *Bona Fide Purchaser*

Assuming Pinez obtained the option securities in violation of federal securities law, the parties agree that the enforceability of Lehman's interest in those options as against competing parties ultimately hinges upon Lehman's status as a bona fide purchaser. *See Restatement of Restitution,* § 172, cmt. c, at 694. (commenting that the bona fide purchaser doctrine applies "not only to absolute transfers [i.e., purchases], but also to transfers as security, to mortgages, pledges and legal liens."). The parties' bone of contention is whether federal or state law governs the standard to be applied.

#### 1. *Federal Law*

Although state law governs in general the rights and duties of sellers and purchasers of goods, the effect of illegality under a federal statute is a matter of federal law. *See* 9 Louis Loss & Joel Seligman, *Securities Regulation* 4305 (3d ed.1992). Accordingly, Lehman contends that the Court must look to federal law to determine when a lienholder with a property interest in securities that are tainted by a prior illegal securities violation

---

**13.** Paragraph 23 of the Client Agreement states that "[t]his agreement ... shall be governed by the laws of the State of New York." Paragraph 14 further provides Lehman with "all of the rights and remedies available to a secured party under the New York Uniform Commercial Code.".

**14.** Pinez executed a "Margin Account Agreement" as a condition for opening his margin account in September of 1996.

**15.** Article 8 of the New York Uniform Commercial Code was recently repealed and replaced by a new article approved on September 10, 1997 and effective October 10, 1997. 1997 N.Y.Laws

Ch. 565 § 1–a. Because the newly enacted article does not affect an action or proceeding commenced before the effective date of the Act, the Court applies the former version to the instant case filed in February of 1997. *Id.* at § 6.

**16.** At various points in its briefs, Lehman refers to the date of acquisition of its lien as either February 7, 1997 (the date of the options trades), or February 11, 1997 (the date of the margin call). Throughout this opinion, I assume that February 7, 1997, i.e., the date of attachment, is the key date, but the point has not been well briefed.

is entitled to bona fide purchaser status. Specifically, Lehman relies on sections 29(b)(2) and 29(c)(1) of the Securities Exchange Act of 1934. Section 29(b)(2) of the Act states:

> Every contract made in violation of any provision of this title or of any rule or regulation thereunder ..., shall be void (1) as regards the rights of any person who, in violation of any such provision, rule, or regulation, shall have made or engaged in the performance of any such contract, and (2) *as regards the rights of any person who, not being a party to such contract, shall have acquired any right thereunder with actual knowledge of the facts* by reason of which the making or performance of such contract was in violation of any such provision, rule or regulation....

15 U.S.C. § 78cc(b) (Emphasis added). Section 29(c) provides:

> Nothing in this title shall be construed (1) to affect the validity of any loan or extension of credit (or any extension or renewal thereof) made or of any lien created ... unless at the time of the making of such loan or extension of credit (or extension or renewal thereof) or the creating of such lien, the person making such loan or extension of credit (or extension or renewal thereof) or acquiring such lien shall have *actual knowledge of facts* by reason of which the making of such loan or extension of credit (or extension or renewal thereof) or the acquisition of such lien is a violation of the provisions of this title or any rule or regulation thereunder, or (2) to afford a defense to the collection of any debt or obligation or the enforcement of any lien by any person who shall have *acquired such debt, obligation, or lien in good faith for value and without actual knowledge of the violation of any provision of this title* or any rule or regulation thereunder affecting the legality of such debt, obligation, or lien.

15 U.S.C. § 78cc(c) (Emphasis added).

 Relying first on section 29(b)(2), Lehman argues that federal law renders "void" (i.e. voidable) only those interests, debts, and liens acquired by parties who have "actual knowledge" of the illegal transactions by which the interests were obtained, and that all other purchasers should be construed as a bona fide purchasers under federal law. A close examination of the turgid statutory language indicates, however, that section 29(b)(2) does not aid Lehman. Section 29(b) concerns only the interests of: (1) people who have *themselves* made a contract in violation of federal securities law, *see* § 29(b)(1), 15 U.S.C. § 78cc(b)(1); or (2) people who are not parties to the violative transaction but who "*have acquired any right thereunder.*" *See* § 29(b)(2), 15 U.S.C. § 78cc(b)(2) (emphasis added). Because Lehman acquired its contractual and property interests under the margin agreement with Pinez and not under the allegedly violative options transactions between Pinez and the defrauded investors, section 29(b)(2) is inapplicable to Lehman under the plain "thereunder" language of the provision. This interpretation is consistent with the various cases that have applied section 29(b). *See, e.g., Levine,* 881 F.2d at 1175–76 (stating that 29(b) gives an innocent party to fraudulent contract the right to have it set aside as voidable); *Cameron v. Outdoor Resorts of America, Inc.,* 608 F.2d 187, 195 (5th Cir.1979), *reh. granted in part on other grounds,* 611 F.2d 105 (1980) (holding that under section 29(b), an innocent lender without actual knowledge of securities law violations could enforce notes and foreclose on defaulted mortgages of which it had taken by assignment); *Securities and Exch. Comm'n v. Stephenson,* 720 F.Supp. 370, 372 (S.D.N.Y.1989) (noting that under 29(b), the guilty party to an illegal securities contract holds title that is voidable at the option of the defrauded seller); *see generally* 9 Loss & Seligman, *supra,* at 4304 (stating that "[o]nly a party to the contract" can use Section 29(b)).

 Unable to shoehorn its claims into Section 29(b), Lehman next argues that Section 29(c)(1) applies to the SEC's efforts to assault the validity of its lien, and that the identically phrased actual knowledge requirement of section 29(b)(2) applies equally to any such attempt at invalidation. Section 29(c)(1) shields from attack the "validity" of a lien of one who "at the time of ... the creating of [a] lien ... acquir[es] such lien"

without "actual knowledge of facts by reason of which ... the acquisition of such lien is a violation of the provisions of this title." 15 U.S.C. § 78cc(c)(1). The First Circuit has construed the actual knowledge requirement of this section as affording no protection to a brokerage house that "had actual knowledge of facts which, upon reasonable inquiry," would have revealed that its margin agreement was in violation of the Securities Act. *Landry v. Hemphill, Noyes & Co.*, 473 F.2d 365, 372 (1st Cir.1973), *cert. denied*, 414 U.S. 1002, 94 S.Ct. 356, 38 L.Ed.2d 237 (1973); *cf. Graham v. White–Phillips Co.*, 296 U.S. 27, 32, 56 S.Ct. 21, 23, 80 L.Ed. 20 (1935) (holding that one who is willfully blind to notice of defect in title is not acting in good faith under holder in due course statute). Because the validity of Lehman's lien and any contract rights born out of the margin account agreement between Lehman and Pinez are not, and have never been, challenged by the SEC as violative of federal securities law, section 29(c)(1) is simply inapposite. *See* 9 Loss & Seligman, *supra*, at 4303 n. 263.

■ The final question is whether the glass slipper fits Section 29(c)(2). Section 29(c)(2) provides that nothing in the Securities Exchange Act offers "a defense to the collection of any debt or obligation or the enforcement of any lien by any person who shall have acquired such debt, obligation, or lien in *good faith* for value *and without actual knowledge* of the violation of any provision of this title or any rule or regulation thereunder affecting the legality of such debt, obligation, or lien." 15 U.S.C. § 78cc(c)(2) (emphasis added). For section 29(c)(2) to apply, the party asserting the lien or debt· must have (1) acquired its right (2) in good faith; (3) for value; and (4) without actual knowledge of the violation. *Mallis v. F.D.I.C.*, 568 F.2d 824, 828 (2d Cir.1977); *Okin v. Sec. and Exch. Comm'n*, 154 F.2d 27, 31 (2d Cir.1946) (holding that Section 26(c) "forbids a construction which will invalidate a loan or· a renewal thereof in the hands of a bona fide holder but not when held by one who had actual knowledge of the prohibitions of the

Act."), *cert. denied*, 329 U.S. 775, 67 S.Ct. 186, 91 L.Ed. 666 (1946).

Interestingly, section 29(c)(2) differs from section 29(c)(1) in at least two respects. First, it adds a "good faith requirement." Second, it provides that a person seeking the protection of the section must have "actual knowledge of the violation," in contrast to "actual knowledge of facts by reason of which the acquisition of such lien is a violation." While I could find no explanation for these differences in the case law or treatises, it seems reasonably clear that: (1) consistent with the interpretation of sections 29(b)(2) and 29(c)(1), section 29(c)(2) requires that a lienholder's actual knowledge be contemporaneous with the acquisition of its right under contract. 9 Loss & Seligman, *supra*, at 4303 n. 263; *cf. Berman v. Thomson*, 284 F.Supp. 521, 524 (N.D.Ill.1968) (holding Section 29(c) inapplicable where the loan was made well in advance of the violation and could not have been made "with actual knowledge of the violation or the facts constituting it."); and (2) in contrast to the identically phrased "actual knowledge" requirements of 29(b)(2) and 29(c)(1), the language in section 29(c)(2) distinguishes between "good faith" and "actual knowledge."

Focusing on the "actual knowledge" component, Lehman relies on *Gunter v. Hutcheson*, 674 F.2d 862 (11th Cir.1982), *cert. denied*, 459 U.S. 826, 103 S.Ct. 60, 74 L.Ed.2d 63 (1982) to argue that Section 29(c) of the Exchange Act governs Lehman's status as a bona fide purchaser.[17] In *Gunter*, the creditor acquired by assignment a note that was made in violation of federal securities law, and the debtors, innocent parties to the original note agreement, sought to rescind the obligation. Recognizing that section 29(c) "controls the relative rights of two innocent parties," the *Gunter* Court concluded that the creditor (the FDIC) had a defense under Section 29(c) to the rescission action even though it had notice of a possible claim by plaintiffs because it acquired the "tainted" note (the debt) for value, in good faith and

---

**17.** While Lehman construes *Gunter* as support for the application of section 29(c)(1), the *Gunter* Court's holding as to the protection a "section 29(c) defense" affords a creditor who acquires a note "for value, in good faith and without actual knowledge" of a violation of the Act appears to refer to the language of section 29(c)(2), 674 F.2d at 874.

without actual knowledge of the violation. *Id.* at 876. Lehman argues that section 29(c) affords greater protection to bona fide purchasers than do most states, given *Gunter's* acknowledgment that Congress expanded the common law protection of innocent purchasers by imposing a subjective "actual knowledge" test instead of a more "lenient" notice standard of state holder-in-due-course statutes. *Id.* The Court also noted, however, that "if a transaction is actually a sham, then the 'good faith' element of the defense is lacking and § 29 would not apply." *Id.* at 876 n. 20.

Although section 29(c)(2) appears to apply to actions involving the enforcement of a lien, the case law on this section is sparse. The circumstances under which section 29(c) has typically been held to apply—i.e., when an innocent third party acquires rights as an assignee of a debt agreement violative of the securities laws—are absent here. *See also Gilman v. F.D.I.C.*, 660 F.2d 688, 693–95 (6th Cir.1981) (involving action to rescind a loan in violation of margin requirements). Indeed, in the sixty-three year existence of the Exchange Act, I could not find any reported cases factually similar to the instant one.

Nonetheless, although the fit is not perfect, the Court concludes that federal law governs Lehman's status as a bona fide purchaser in an action to enforce its lien and that section 29(c)(2) is the controlling provision.

### 2. *State Law*

Although disputing the very applicability of section 29(c)(2), the SEC focuses primarily on the "good faith" component of that section. 15 U.S.C. § 78cc(c)(2). The SEC argues that regardless of whether Lehman's bona fide purchaser status is governed by section 29(c)(2) or by the New York Uniform Commercial Code, both standards include the element of good faith, and the application of either produces the same result. The Court agrees.

Under the New York Uniform Commercial Code and the terms of the margin agreement, the acquisition of Lehman's lien was simultaneous with the February 7 options transactions, and as with the application of the federal statute, that is the time at which Lehman's state of knowledge must be assessed. *See* N.Y. U.C.C. §§ 8–321, 8–304. Although a mere purchaser of securities that are tainted by a prior securities violation is subject to having his interest voided at the option of the victim, *see* N.Y. U.C.C. § 8–301(1), both parties acknowledge that "[a] bona fide purchaser ... acquires his interest in the security free of any adverse claim." N.Y. U.C.C § 8–302(3). A "bona fide purchaser" is defined as "a purchaser for value in good faith and without notice of any adverse claim." N.Y. U.C.C. § 8–302(1). "Good faith" is defined as "honesty in fact in the conduct of transaction concerned." N.Y. U.C.C. § 1–201. "[T]o constitute notice of an adverse claim or a defense, the purchaser must have knowledge of the claim or defense or *knowledge of such facts that his action in taking the security amounts to bad faith.*" N.Y. U.C.C. § 8–304(4) (emphasis added); *see also* N.Y. U.C.C. § 8–304 cmt. 1 (McKinney 1990) ("suspicious circumstances of the transaction may give a purchaser (particularly a commercially sophisticated purchaser such as a broker) 'reason to know'.").

The test of good faith and actual knowledge under New York law is a subjective one. *See Hartford Accident & Indemnity Co. v. American Express Co.*, 74 N.Y.2d 153, 162, 544 N.Y.S.2d 573, 542 N.E.2d 1090 (1989) (interpreting the analogous provision in section 3–304(7) of the N.Y. U.C.C. and concluding that "holders in due course are to be determined by the simple test of what they actually knew, not by speculation as to what they had reason to know, or what would have aroused the suspicion of a reasonable person in their circumstances."). In arguing that both the federal and New York Uniform Commercial Code "actual knowledge" tests are subjective in nature, Lehman maintains that "there is virtually no distinction between the state and federal standards." (Lehman Supp. Mem. Opp., March 14, 1997, at 10.) What Lehman fails to acknowledge, however, is that even a subjective test does not absolve a person with actual knowledge of suspicious circumstances to meet a duty of reasonable inquiry. *See Fallon v. Wall Street Clearing Co.*, 182 A.D.2d 245, 586 N.Y.S.2d 953, 956 (1992) (holding that transferee of investment

security who claims to be a *bona fide* purchaser "is under obligation to investigate suspicious circumstances which might suggest the existence of an adverse claim."); *In re Legel Braswell Gov't Sec. Corp.; Plano Savings & Loan Ass'n v. Irving Trust Co.,* 695 F.2d 506, 512 (11th Cir.1983) (interpreting New York's bona fide purchaser laws and concluding that the purchaser's "disregard for suspicious circumstances, of which it had actual knowledge, constitutes a taking in bad faith"); *Garner v. First Nat'l City Bank,* 465 F.Supp. 372, 382–83 (S.D.N.Y.1979) (concluding that a pledges exhibited "such disregard of suspicious circumstances" that it "constitute[d] 'bad faith'" within the meaning of N.Y. bona fide purchaser law); *Gutekunst v. Continental Ins. Co.,* 486 F.2d 194, 195–96 (2d Cir.1973) (per curiam) ("New York law is that only actual knowledge or disregard of suspicious circumstances may constitute evidence of bad faith.").

The Court thus concludes that even if New York law governs the standard for Lehman's status as a bona fide purchaser, a failure to act on actual knowledge of suspicious circumstances constitutes bad faith on the part of a lienholder.

### E. *Likelihood of Success*

■■■ Lehman argues that it had no actual knowledge on February 7, 1997 that: (1) the financial statements of Centennial fraudulently overstated income, earnings and inventory; (2) Pinez altered inventory tags so as to fool the Centennial auditors; or (3) that for any other set of reasons, Pinez was trading on the basis of material non-public information about the affairs of Centennial. (Lehman Supp. Mem. Opp., March 14, 1997 at 5.) The Court concludes, however, that the SEC has demonstrated a likelihood of success in proving its contention that Lehman was not a bona fide purchaser under federal or state law when it acquired its property interest in the options and proceeds in Pinez's margin account in February of 1997. *Fidelity Bank, N.A. v. Avrutick,* 740 F.Supp. 222, 236 (S.D.N.Y., 1990) ("A party challenging the good faith and lack of notice of a holder bears a substantial burden."). The SEC has produced strong credible evidence

to establish that Lehman was not acting in good faith when it purchased and sold 5400 option securities for Pinez's margin account on February 7, 1997. At that time, Lehman had actual knowledge of facts, which upon reasonable inquiry, would have clearly revealed Pinez's violation of the securities laws. Thus Lehman is not entitled to the protection afforded to "innocent" purchasers under section 29(c)(2) of the Exchange Act or the New York Uniform Commercial Code. With so much money at stake, Lehman disregarded suspicious circumstances and played ostrich to protect the collectibility of its ever growing margin indebtedness. Centennial was just a phone call, e-mail, or fax away. In particular, I rely on the following facts:

(1) Pinez, the CEO of Centennial who unquestionably had access to nonpublic information about the company, placed an order for approximately 6,000 combo option trades at 1:00 PM on a Friday and insisted that the trades be completed by 4:00 PM that same day.

(2) The requested "zero-cost collar" transaction, which was to be made regardless of the market price of Centennial stock, was effectively a multi-million dollar "bet" made by the CEO of Centennial that the company's stock would continue to decline. This last-minute request came in stark contrast to Pinez's prior refusal to collar. The urgency of the pace resulted in a cost of $320,000 to execute a collar which was supposed to be "zero cost."

(3) Lehman knew about articles dated January 23, 1997 and February 4, 1997, appearing in *Financial World* and the *Boston Globe* respectively, reporting on allegations that Pinez had falsified his academic credentials and that Centennial's gross profit margins had been overstated.

(4) In a letter dated January 31, 1997, the SEC specifically advised Lehman's Office of General Counsel that it was conducting an inquiry into Centennial, and it requested documents relating specifically to Lehman accounts opened by Emanuel Pinez. On February 7, the day that the options trades were made, Lehman responded to the SEC's request, sending the agency copies of the account documents

and monthly statements for Pinez's accounts.

(5) Six months earlier, on September 25, 1996, Franklin Pierce, Pinez's account representative at Lehman, was made aware in writing of a possible prior insider trading violation involving Pinez in the matter of the Felix trust account trading in Centennial stock.

(6) Pierce was so acutely aware of concerns about insider trading that he surmised on February 7 that the reason for the urgency may be that Pinez was about to resign or step down. Pierce discussed the good chance that this may happen with his supervisors.

(7) Lehman had a strong motive to assist Pinez in making the option trades to protect its interest in the value of its $6 million margin loans to Pinez.

Although there is no evidence in the current record suggesting that Lehman had actual knowledge of the precise nature of the insider trading (i.e., the fabrication of inventory tags), the SEC has produced such compelling direct and circumstantial evidence of actual knowledge of highly suspicious circumstances—all pointing to insider trading and all triggering a duty to make reasonable inquiry—that Lehman flunks the subjective good faith and actual knowledge tests under both federal and state law.

Because the SEC has demonstrated a substantial likelihood of success on the merits of its claim that Pinez committed securities fraud in engaging in the options trades, and because the SEC is likely to be successful in establishing that Lehman is not a bona fide purchaser of those securities and their proceeds under state or federal law, this Court finds it proper to continue the interlocutory freeze of Pinez's margin account assets held in constructive trust in escrow by Lehman. (Amended Complaint ¶¶ 76–81.) *See Lauer,* 52 F.3d at 671 (finding that, to order an asset freeze, the court "need only have sufficient confidence about both jurisdiction and the merits to make the issuance of a preliminary injunction a reasonable measure for minimizing the possibility of error.").

### ORDER

The SEC's request for a preliminary injunction is *DENIED IN PART AND ALLOWED IN PART* as follows:

(1) The motion for a preliminary injunction prohibiting Pinez from committing further securities violations is *DENIED* without prejudice pending the outcome of his criminal trial; and

(2) The motion for a preliminary injunction freezing Pinez's assets, including the proceeds from the options transactions that are being held in escrow by Lehman Brothers, is *ALLOWED.*